**MACDONALD et al. v. WINFIELD CORPORATION et al.**
**Civ. A. No. 8708.**

United States District Court
E. D. Pennsylvania.
Aug. 30, 1950.

See also D.C., 82 F.Supp. 929.

155

Milton M. Gottesman, Washington, D. C., Henry Temin, Philadelphia, Pa., Robert L. Wright, Washington, D. C., for plaintiff.

Raymond J. Bradley, Owen B. Rhoads, Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

This is a suit for damages for breach of contract and unfair competition. The substance of the cause of action is that the defendant, having agreed to transfer to the plaintiff an established library equipment business, refused to carry out certain of its obligations under the agreement and entered into generally unfair competition with the plaintiff. The defendant's right to compete is not questioned, but it is charged that the defendant's trade practices and methods constituted, in effect, an unfair and malicious attempt to appropriate or destroy the goodwill of the business.

The case centers chiefly upon the defendant's representations to the trade that it and not the plaintiff was the owner of the business, coupled with the defendant's use, in connection with its products and services, of the name "Snead" by which the business had long been publicly known.

Snead & Company was a manufacturing corporation with its plant at Orange, Virginia. Among other things, it was engaged in making and installing equipment for libraries. This branch of the business represented from 15% to 30% of the whole. It was a more or less separate department and required special experience and engineering skill. It had been carried on under the Snead name in various forms for nearly 100 years.

In July, 1946, Snead & Company was in serious financial difficulty. Negotiations for its rehabilitation culminated in a contract dated August 9, 1946,[1] by which the defendant, Winfield Corporation,[2] agreed to purchase the outstanding common stock and to convey to Macdonald (president of Snead & Company and owner, as trustee, of most of the stock) certain assets and rights pertaining to the library business. Although not conceded by the defendant, there is no doubt that it was the intention and the mutual understanding of the parties that Macdonald[3] was to get the entire library "business" (a term perfectly well

---

1. The provisions of the contract pertinent to this controversy are set out at the end of this opinion.

2. At the time the contract was executed, this defendant's corporate name was The Phoenix Iron Company. It was later changed to Winfield Corporation. For convenience I have used the word "defendant" interchangeably as meaning either or both of the two defendants. Winfield Corporation controls Virginia Metal Products Corporation (formerly Snead & Company) and there is no need of making any distinction between the defendants.

3. On September 1, 1946, Macdonald and others had incorporated Angus Snead Macdonald Corporation for the purpose of entering the library equipment business. Macdonald has been its president to the present time and has directed its policies. For convenience both the individual and the corporation will be referred to throughout as "Macdonald". Later on Macdonald organized a subsidiary corporation, named it Snead & Company and did business under that name, registering it as an assumed name under the Virginia statute for the purpose of doing business in Virginia.

understood by business men, whatever its exact legal meaning) and that the defendant would take a number of steps relating to the transfer of assets, in order to preserve the continuity of that business and to enable Macdonald to establish himself in the field; and I hold that to be the meaning and effect of the contract.

Apparently as an afterthought, the defendant now contends that something short of a transfer of the entire business was contemplated, namely, merely the right to set up a selling organization to market equipment manufactured by it. Certainly its managing officers did not understand it that way. For example, shortly after the stock was transferred the defendant's general manager, in a letter to one of Macdonald's associates, referred to the contract as "providing in part that under certain conditions the library and bookstack business would be turned over on or before October 18, 1946 to a company to be formed by Mr. Macdonald." In another letter a month or two later, to a prospective customer, the defendant said, "For your information, Snead & Company is definitely going out of the library and bookstack business, and the Angus Snead Macdonald Corporation has been formed to take over the library and bookstack business of Snead & Company." Similar expressions appear in other letters.

Upon the disputed point, whether the defendant remained free to use the name "Snead" in competition with Macdonald, I think that the contract unmistakably implies an agreement on the part of the defendant that it will not do so. The contract (Paragraph 14a) recites that some or all of the stockholders of Snead & Company are desirous of continuing to be engaged in the sale of products pertaining to library equipment, and then goes on (Paragraph 14c) to say, "As soon as the undersigned changes the name of the corporation, the said Angus S. Macdonald, Trustee, shall have the right to use the name 'Snead' or 'Snead & Company'", or in other words, "You are planning to carry on the library business (hitherto carried on by us under the name Snead). From now on you may use the name Snead, and we will change our name to something else." What conclusion could any intelligent person draw from this provision of the contract other than that the defendant would no longer use the name? What other explanation can be suggested for the provision that the defendant would change its name and so eliminate "Snead" from its corporate title? The defendant has suggested none, nor can I think of any.

A letter from Thomson, who had been the defendant's president during the period of contract negotiations, gives a pretty clear indication of what the defendant understood about the use of the name. In answer to an inquiry from the defendant's new president, he says that he can see no reason why the name could not be freely used in the part of the business not connected with library equipment but "I would stay away completely from using that name regarding libraries and bookstacks."

The circumstances surrounding the deal confirm the view that the defendant did not intend to keep the right to use the name. While there was nothing to prevent Winfield from continuing in the library contracting business, the fact is that, at the time, its officers not only had no intention whatever of doing so and did not take any steps in that direction for months but had definitely decided to give it up altogether. The defendant's secretary and treasurer testified: "During the period of September, October and November, the general policy was that Virginia Metal Products, or as it was then, Snead and Company, was giving up the library business, they were going out of the library business." It is also quite apparent that they considered the name "Snead" of little value. Dun & Bradstreet had issued a pink slip against it. A receivership proceeding was pending and it had filed a petition in bankruptcy under Chapter X, 11 U.S.C.A. § 501 et seq. It was not until much later, when they decided to go into the business and took the first step looking toward competition, that they became convinced that the name stood high with architects, colleges and libraries, and possessed a goodwill developed through years of expert and highly satisfactory performance,

a good deal of which had been under Macdonald's direction and supervision.

 The decisions cited by the defendant to the effect that the grant of the right to use the seller's name in connection with the sale of a business does not imply that the seller has relinquished it, merely state one phase of the general rule that what is not expressed in a contract will not ordinarily be implied. In all the cases the Courts have been careful to point out that, in spite of the rule, such agreement may be implied if the terms of the contract and the circumstances clearly disclose an intention to that effect. For example, in F. T. Blanchard Co. v. Simon, 104 Va. 209, 51 S. E. 222, 223, the Court said that an intention to divest one's self of the right to use one's own name in business and transfer it to another "will not readily be presumed, but must be clearly shown. Where it is so shown, the transaction will be upheld * * *."

 "If it can be plainly seen from all the provisions of the instrument taken together that the obligation was within the contemplation of the parties when making their contract or is necessary to carry their intention into effect—that is, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it." 12 Am.Jur. (Contracts) Sec. 239. "In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made, and to refrain from doing anything which will destroy or injure the other party's right to receive the fruits of the contract." 17 C.J.S., Contracts, § 328, p. 778 and cases cited. See also Uproar Co. v. National Broadcasting Co., 1 Cir., 81 F.2d 373, 377.

 When a corporation conveys its business, expressly granting to the purchaser the right to use the name and agreeing to eliminate the name from its corporate title, at the same time announcing to customers that it is definitely going out of the business, its agreement not to use the name is, in my opinion, a necessary implication from the provisions of the instrument.

The defendant's present effort to justify its conduct on the ground that it owns the stock of a subsidiary called "Snead Inc." is a quibble. That company was a mere real estate holding device amounting to no more than a department of the defendant and never at any time did any business of any kind. "Snead" is not the defendant's name nor any part of its corporate title and has not been since January, 1947, and the question of the abstract right of a corporation to compete in business under its own name is not in the case.

Pursuant to the agreement of August 9, 1946, the stock of Snead & Company was transferred to Winfield, and Macdonald proceeded to set up an organization. A substantial number, apparently a majority,[4] of the Snead employees who had special skill and experience in the library business left the defendant and went with Macdonald.

No sooner had the stock been transferred than the parties ran into difficulties in connection with the provisions of the contract relating to the assets of the library business and they were soon hopelessly at loggerheads. There were disputes about almost every item. The plaintiff contends that the defendant refused to perform a number of its contract obligations, thereby seriously hindering Macdonald's efforts to establish himself. This is true as to some, but not all, of the terms of the contract.

 Paragraph 14(e) gave Macdonald the right to purchase "any or all" of the special tooling, patterns, models and samples used exclusively in the library business at its book value "if any". The way in which the company kept its records made it extremely difficult to arrive at anything which could be called "book value" for the tools. An inventory of them was prepared

---

4. In a letter to a prospective customer, dated December 13, 1946, the defendant's vice-president and general manager stated that the Macdonald Corporation has "the former engineering talent of Snead & Company".

and the tools offered to Macdonald at a figure ($4,532.50) arrived at by estimating the cost of each tool and depreciating it at the rate of 7½% per annum. On the other hand it appeared from the company's income tax return that all these tools had been depreciated to zero as of December 31, 1945. Macdonald refused the tools at the defendant's price but did accept, on July 13, 1947, a lot of patterns, samples and models at a figure of $1.00. I think that there was a breach of the contract in this regard by the defendant, but not a very important one.

By paragraph 14(a) the defendant agreed to assign to Macdonald the "patent rights" applicable to products pertaining to library equipment. The defendant took the position (which it still maintains) that the expression "patent rights" does not include the patents themselves, and offered Macdonald (April 16, 1947) a royalty-free license, which Macdonald refused. The patents themselves have never been assigned or tendered. The defendant's position cannot be sustained.

■ The fact that a distinction between patents and patent rights was drawn in a case (cited by the defendant) construing the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., is of very little help in determining what these parties meant when they used the latter term in their contract. The paragraph of the contract in question begins by referring to contracts on Snead & Company's books, relating to "products pertaining to library equipment * * * as covered by the patent rights applicable thereto." Of course, Snead & Company were not licensees or assignees but owners of the patents and the products in question were not covered by any "patent rights" as the defendant now defines that term, but by the patents themselves. Whether or not there is any legal distinction between the two, it is evident that the parties to the contract used the words "patent rights" as meaning patents and obviously considered them as the same thing.

■ The defendant's refusal to assign the patents was a breach of the contract. It is true that the defendant has never attempted to enforce them against Macdonald or to prevent him from selling or having manufactured the products covered by them. The importance of the matter lies in the fact that the record ownership of the patents put the defendant in a position, when it was bidding against Macdonald, to say to the customers, as it repeatedly did, that it was the owner of all the patents that Snead & Company ever had—a statement, the implications of which could not but have had its effect upon the prospective purchasers of the equipment.

Paragraph 14(a) also contains an agreement by the defendant to assign to Macdonald the contracts for the installation of library equipment which were on the company's books on August 9, 1946. There were a large number of them, amounting in all to about $400,000. The defendant, about the middle of October, 1946, in the course of abortive negotiations looking toward making a supplemental contract, offered the whole batch to Macdonald, who refused them as offered, claiming the right to reject at least one of them on the ground that it would involve a loss. Later on, the defendant completed most of the contracts on the books for its own account, incurring a total loss of about $150,000, for which amount it has counterclaimed in this action. The plaintiff, on the other hand, contends that the tender was of no effect and that the defendant's whole course of conduct in connection with these contracts constituted a breach upon its part, for which he is entitled to damages.

■ The parties are in full agreement that "The purpose of this provision was evidently to give the new company a quick source of revenue which would enable it to establish itself." It is plain that the provision was entirely for Macdonald's benefit, and I so find.[5] This being so, there is no reason why he could not waive or refuse to accept performance of it if he came

<hr />

5. It was held in Fred W. Mears Heel Co. v. Walley, 1 Cir., 71 F.2d 876, that the trial Court's ruling that a condition in a contract was inserted for the benefit of the seller was a finding of fact.

to the conclusion that the contracts would be a burden, or for any other reason. "* * * it follows as a matter of law that the plaintiff may waive the condition inserted in the contract for his benefit, and that the defendant has no right to insist on the performance of the condition." Walley v. Fred W. Mears Heel Co., D.C., 4 F.Supp. 277, 278.

Macdonald's contention that the defendant breached the contract in respect of the assignments must be considered in connection with Paragraph 14(a) which provides "the undersigned will endeavor to manufacture the required equipment and materials for its account and will use its best endeavors to produce such products for the new company." This agreement has a close relation to the promise to assign the contracts. Obviously, Macdonald, who had no manufacturing plant, could not take any steps toward completing the contracts, should they be assigned to him, until he was assured of some way of getting the equipment made. Of course, he could have gone elsewhere, as he did later, but in October, 1946, there seemed to be some prospect that the defendant would do the work. However, the whole matter was up in the air. The defendant had agreed to manufacture for Macdonald at cost plus 10%, but no formula acceptable to both parties for determining cost had been arrived at and as a matter of fact none was, until months later. There were also two contracts (involving a type of library installation known as "modular construction") which the defendant definitely refused to work upon under any conditions. After April 9, 1947, the defendant gave quotations to Macdonald when requested but Macdonald did not make credit arrangements satisfactory to the defendant which was a condition precedent to its obligation to manufacture. In February, 1947, he had made arrangements to have another concern manufacture library equipment for him.

I think it unnecessary to decide whether the defendant breached either the term relating to the assignment of contracts or to manufacturing the equipment. If the defendant was guilty of a breach, Macdonald has no provable claim for damages in respect of it. The contracts included installing the equipment sold, a matter calling for special skill and experience. They were therefore nonassignable without the consent of the customers and there is no evidence that any customer would have agreed to accept Macdonald in place of the defendant. In fact, in view of Macdonald's financial position at the time, it is even more a matter of conjecture whether any would. The result is that neither party has shown that a breach of this term by the other could have made any difference to him, and this applies equally to Macdonald's claim for damages and to the defendant's counterclaim, even had the defendant's right been otherwise established.

Paragraph 14(f) relates to sales arrangements for library equipment products with foreign concerns. I cannot find that Macdonald was deprived of this business by any act on the part of the defendant or that the defendant breached its obligation in respect of this provision.

I have gone into the alleged breaches by the defendant of these more or less secondary provisions of the contract perhaps more fully than strictly necessary, but a great deal of testimony and a number of requests are directed to them. Actually, the whole matter touches only the fringe of the main issue in the case.

In February, 1947, the defendant stopped referring inquiries about library equipment to Macdonald and began to compete with him for the business. By May it had obtained contracts for approximately $150,000 of business, but not until July, 1947, did it go into all-out competition, making use of the Snead name in every way it could, short of putting it back into its corporate title.

█ The facts are not in dispute. In fact, there could be no dispute that, from July, 1947, on, the defendant did everything possible to convince the trade that it and not Macdonald was carrying on the identical business which it had agreed that

he should have.[6] This, in view of the contract, made the defendant's competition unfair by any test, but the defendant went a great deal further. In various letters and statements to the trade it created the impression that Macdonald's use of the Snead name to identify his company with the old Snead business was not only without justification but deliberately misleading and intended to confuse customers. Incidentally, the defendant tried (unsuccessfully) to have mail addressed to Snead & Company at Orange, Virginia, delivered to it and so divert inquiries for new business.

Typical of the kind of competition which the defendant carried on is a letter written by its president to the University of Washington architects. In it, among other things, the defendant says, "When we changed the name of Snead & Company to Virginia Metal Products Corporation on the first of this year the Corporation Commissioner of Virginia informed us the retention of the name of Snead Incorporated would protect us from *anyone* [7] using the corporate name of Snead & Company. * * * However, about sixty days ago the Angus Snead Macdonald Corporation registered the name of Snead & Company with the County Clerk in Orange, Virginia, as an assumed name for the Angus Snead Macdonald Corporation and directed the postmaster to direct all Snead & Company mail to him. * * * Mr. Macdonald is again trying to create more confusion by virtually dropping the name of Angus Snead Macdonald Corporation and directly using the name of Snead & Company. * * * We own all of the patents that Snead & Company have ever had with the exception of the 'Modular Construction' patents, which we believe worthless. We own all of the tools, machinery, plant, properties, etc., that the old Snead & Company ever had and when we say the old Snead

& Company we mean the Snead & Company that has been identified for 98 years in the library business." The effect is to falsify completely the whole situation, particularly in view of what the letter omits, namely, that by defendant's own grant Macdonald had full right to use the name, that even on its own interpretation of his rights he was entitled to the free use and protection of the patents, and that the post office had confirmed his right to receive the mail. The letter carries, by the plainest kind of implication, several vital misrepresentations: namely, that Macdonald has no right to use the name or the patents (the latter a disturbing suggestion for architects and contractors), that his business has no legitimate connection with the old Snead library business, that he is not equipped to carry it on and that his company is a slightly dubious concern trying to encroach upon the defendant's old established business by questionable methods. It is unnecessary to multiply examples. Plenty of similar statements can be found in the record.

Even if the defendant had limited itself to using the Snead name in competition with Macdonald it is hard to see how it could be argued that it was acting in good faith under a mistaken belief as to its rights, but in view of its misrepresentations to the trade about Macdonald's business, there can be no pretense of good faith as to any part of its competition.

The defendant's competition with the plaintiff has been clearly unfair and malicious.

That the defendant's wrongful conduct caused damage to the plaintiff in a substantial amount—not only in business which the defendant took, itself, amounting to nearly $1,500,000, but also in business which went to other competitors—is too plain to require much discussion. Besides this, the evidence shows specific instances in which

---

6. The defendant's president testified: "I tried to tell everybody in our organization, if they thought 'successor' was the right way of putting it, I said, no, we are not a successor to Snead & Company, we are the company which was known as Snead & Company. * * * I think everybody in our organization had that drummed into him." The defendant in its requests has asked the Court to find as a fact that in soliciting new library business "it used the name 'Snead' and 'Snead & Company' to identify itself and its products in its advertisements and letters soliciting business."

7. Emphasis supplied.

the defendant's insistence that it, and not Macdonald, was the sole owner of the Snead business, patents, tooling, etc., created confusion and raised misgivings in the minds of prospective customers. In at least two cases where such assertions were made the contracts were awarded to competing firms although Macdonald was the low bidder. There were always plenty of other competitors in the bidding, and architects and contractors are usually anxious to steer clear of a situation which may involve them in litigation, especially if patent rights enter into it. A tabulation showing the results of bidding on some 178 bookstack contracts shows that when both the defendant and Macdonald bid neither of them could get anything like the proportion of jobs which they were able to obtain when only one of them bid.

Where the injury done is to the goodwill of a business, the ascertainment of the amount of damages, in money, is never an easy task. One thing which makes the problem in this case exceptionally difficult is that the business was not that of selling a product under open market conditions but was a contracting business of a specialized kind. Like most contracting businesses, it consisted in competing for a limited number of rather large jobs, usually awarded to the lowest bidder after the submission of sealed bids. In such a business it is practically impossible to point to any particular job and say just why it was lost, and the determination of the total damages is bound to have far greater elements of uncertainty than in the ordinary case. This does not mean, however, that contractors are, for that reason, fair game for unscrupulous competitors, without hope of remedy for past injuries. All that can be asked of a plaintiff in any case is the best proof of his loss of which the particular type of case is susceptible.

Another difficulty is that the plaintiff in this case does not have the benefit of the rule-of-thumb method which is generally recognized by the courts as one way of ascertaining damages, namely, a comparison of the volume of business done by the plaintiff before and after the unfair competition began, in order to show how much it fell off. In the present case the competition started almost as soon as Macdonald began his business. Even the old Snead business cannot well be taken as a basis for comparison because it had been completely suspended for some five years as a result of the conversion of the plant to war production and prior to that had been a branch of a larger manufacturing business.

In one respect, however, this plaintiff's position is better than that of the plaintiff in William Goldman Theatres v. Loew's, Inc., D.C., 69 F.Supp. 103; affirmed per curiam, 3 Cir., 164 F.2d 1021. Not only did Goldman have no established, going business at the time of the defendant's conspiracy, but his theatre never opened thereafter. The Court held that that fact did not prevent him from recovering estimated profits which it reasonably appeared he would have made but for the defendant's wrong. Macdonald, on the other hand, was able to survive the competition of the defendant and has for nearly four years maintained himself in the field with a sufficient degree of success to keep the business very much alive. Thus, in the present case the Court is relieved of having to deal with one highly speculative element.

The present case is one in which the wrong is wilful and malicious and in which there can be no doubt that there have been substantial damages, but in which, although the plaintiff has produced all the available evidence, the amount remains extremely uncertain.

Several recent decisions of the Supreme Court, e. g. Story Parchment Company v. Paterson Parchment Paper Company, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, and Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, show the steady progress of the law toward disregarding uncertainty in proving the amount of damages where the wrongful action of the defendant has made it impossible for the plaintiff to measure up to the standard of proof which, 50 years ago, would unquestionably have been exacted. " 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong

has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights." Bigelow v. RKO Radio Pictures, supra, 327 U.S. at page 265, 66 S.Ct. at page 580. The law of Virginia, which governs the damages in this case, is in step with the federal law. "While a litigant cannot escape his obligations to establish his damages with reasonable certainty by the best evidence which is available, still where it is manifest that he is entitled to substantial damages and does the best he can to give the jury all of the information he possesses, he is not to be denied any recovery because he cannot demonstrate the amount of such damages with precision." White Sewing Machine Co. v. Gilmore Furniture Co., 128 Va. 630, 650, 105 S.E. 134, 141.

Throughout the whole discussion, the distinction, recognized by all authorities, between uncertainty as to whether *any* substantial damages resulted and uncertainty as to the amount, should be kept in mind. "If they (damages) are so uncertain, contingent, and imaginary as to be incapable of adequate proof, then they cannot be recovered. When, however, it is certain that substantial damage has been caused by the breach of a contract, and the uncertainty is not whether there have been damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty." Manss-Owens Co. v. H. S. Owens & Son, 129 Va. 183, 105 S.E. 543, 549.

Courts proceed step by step, and while the record in this case presents a situation for which there is no directly controlling precedent, it is plain that in the nature of the case no better proof can be produced, and I think that the evidence is sufficient.

There was competent evidence to the effect that, on a normal volume of business, Macdonald could realize a profit of at least 10%. His opinion that he could have done twice as much business as he did but for the confusion created by the defendant is, of course, a guess and cannot be accepted as the basis of a finding. However, the proven fact is that where he bid alone against outside competition he was awarded 26 of a total of 57 jobs, or nearly 50%, and that where the defendant bid against him he got only 6 of a total of 45, or less than 15%. Incidentally, in the contracts for which the defendant bid and the plaintiff did not, the defendant was awarded 15 out of a total of 16. Of course, there is no absolute certainty that the defendant's competition was what caused the plaintiff to lose so many contracts. It is, however, as certain as anything of this sort can be, that the Snead name and goodwill were a definite factor in the competition. It can also be said that the record shows nothing other than the defendant's competition to account for the poor showing by Macdonald whenever he had to meet it. Apparently there was nothing wrong with his organization. What he was able to accomplish over a period of four years in the face of very adverse conditions demonstrates that he had the requisite experience, personnel and resources to carry on a successful contracting business. Moreover the fact that he was able to obtain 32 contracts for a total of $1,700,000 indicates that he was perfectly able to meet competition in the matter of prices.

Based on the entire record my finding is that the plaintiff has been damaged by the defendant's unfair competition in the amount of $80,000 [8] and I award that sum as compensatory damages.

I am also of the opinion that the case is plainly one for exemplary damages. "That the willful and unauthorized destruction of one's business is ground for the imposition of punitive damages on the wrongdoer has been settled in this state ever since the decision of Peshine v. Shepperson [17 Grat. 472, 58 Va. 472, 94 Am.Dec. 468]."

---

**8.** For reasons stated, I have not allowed anything for alleged losses by either party in respect of the contracts on the defendant's books as of the date of the transfer.

Anchor Co. v. Adams, 139 Va. 388, 392, 124 S.E. 438, 439. The wrong proved in this case is an attempt (not successful, but plainly causing substantial harm and damage) to destroy or, at least, appropriate all the goodwill of an entire business. Even if there had been no evidence upon which an estimation of the amount of actual damage could have been made, an award of exemplary damages would be proper. The much vexed question as to whether exemplary damages can be awarded in connection with nominal damages is not involved. The term "nominal damages" properly used refers to cases where there has been a wrongful invasion of the plaintiff's right but no actual damage of any kind done, in which case nominal damages are awarded merely to vindicate the right. Some courts have also used the expression to mean actual damage of a trivial amount, but, whichever it means, there is no question of "nominal damages" in a case where the existence of a large and substantial loss is clearly shown. In such case there can be no question that an award of exemplary damages is sustainable.

I therefore award the plaintiff exemplary damages against the defendant in the amount of $80,000.

Judgment may be entered for the plaintiff on the defendant's counterclaim.

From what has been said it follows that the plaintiff is also entitled to an injunction restraining the defendant's use of the name "Snead" and its unfair competition with the plaintiff in that and other respects. The terms of the injunction can be settled on submission of an order for judgment.

### Evidence

A great many objections were made, particularly by the defendant, to offers of exhibits and portions of the testimony.

I do not believe that it is necessary to deal with each separately. As has been stated, the facts relating to the kind of competition carried on by the defendant and the fact that it resulted in confusing the customers are not and could not be disputed, nor are the facts upon which I have found that it injured the plaintiff and upon which I have awarded damages.

With regard to the evidence bearing on the meaning and intent of the contract, the parol evidence rule, of course, excludes all testimony relating to negotiations leading up to the formation of the contract. I have not considered any testimony as to what was said or done by the parties prior to August 9, 1946, looking toward the formation of the contract. I received some testimony on the point subject to the objection and, although the defendant, who entered the objection, has based one or two requests for findings of fact upon it, I now sustain all objections to that portion of the testimony.

Statements made by the defendant in writing and orally after the contract was consummated are a different matter. Where the question is whether an unexpressed term is included in a contract by necessary implication or where the meaning of the contract in certain particulars is in doubt, such evidence may always be received as showing the construction put upon the contract by the parties themselves and also as admissions by the defendant as to its understanding of the contract. In settling a point of disputed interpretation, it is not only proper but often necessary for the Court to receive evidence of the circumstances under which the contract was made and under which the parties proceeded to carry it out. Some, but very little, evidence offered for this purpose was immaterial but in general I have considered circumstances existing at the time of contract and thereafter, as well as the subsequent declarations and admissions of the parties in reaching my conclusions.

As to the objections listed in the defendant's brief to certain specific exhibits. In any case in which damages arising from confusion of the trade by unfair competition are involved the evidence necessarily will cover a wide range and include many letters and communications which, taken out of the context, might not of themselves be strictly relevant or material. However, I sustain the defendant's objection to P-4, 37, 42, 43, 44, 51, 82, 94, 100, 103, 104, 106, 115 and the unnumbered exhibits following P-62. All other objections to exhibits are overruled.

164

Both the plaintiff and the defendant have submitted requests for findings of fact and conclusions of law. These requests have been very helpful to the Court, but the foregoing opinion contains what I believe to be a complete statement of all material facts and resulting conclusions of law. All such statements of fact and law may be taken as the Court's specific findings and conclusions and the requests need not be answered.

### The Contract

(14) In the event the undersigned should purchase the said common stock it is agreed with Angus S. Macdonald, Trustee for himself and for all other present stockholders of Snead & Company who shall elect to join with him in the enterprise hereinafter described, as follows:

(a) Whereas, there now exist on the books of Snead & Company contracts calling for the production, delivery and/or erection of products pertaining to library equipment and certain products of a type known as modular construction as covered by the patent rights applicable thereto; and, whereas some or all of the present stockholders of Snead & Company are desirous of continuing to be engaged in the sale of such products, it is agreed that Angus S. Macdonald, Trustee, shall have the right to organize a corporation for this purpose within sixty (60) days from the date of purchase and the undersigned will undertake to assign to the new company said contracts and patent rights applicable to said products pertaining to library equipment and to said modular construction and the undersigned will endeavor to manufacture the required equipment and materials for its account and will use its best endeavors to produce such products for the new company.

(c) That as soon as the undersigned changes the name of the corporation, the said Angus S. Macdonald, Trustee, shall have the right to use the name "Snead" or "Snead & Company."

(e) That the said Angus S. Macdonald, Trustee, shall have the right to purchase any or all special tooling, patterns, models and samples used exclusively in the manufacture and sale of library equipment, modular construction and vending machines and not suitable for use in the manufacture of any other products of Snead & Company, at its book value, if any, as shown on the books of Snead & Company at any time within sixty (60) days from date of purchase of said stock; any special tooling, patterns, models and samples so purchased shall be removed by the purchaser from the premises of Snead & Company within ninety (90) days after request by Snead & Company.

All work done by the undersigned for Angus S. Macdonald, Trustee, or his assigns, under the foregoing provisions shall be paid for at cost plus a percentage of profit to be agreed upon between the parties from time to time. Credit arrangements must be made satisfactory to the undersigned.

(f) That said Angus S. Macdonald, Trustee, shall have the exclusive right to continue and renew existing production and sales arrangements for partitions, and to make similar new arrangements, in all parts of the world, excepting only the United States, its Territories, Possessions, and Canada (the rights in which are reserved to Snead & Company) and to collect and retain all fees, commissions and other emoluments appertaining thereto.