Louis G. WINTER

v.

John A. WELKER, individually and trading as Supreme Motor Freight, and Margie Welker.

No. 16802.

United States District Court
E. D. Pennsylvania.

June 29, 1959.

Abraham L. Shapiro, Philadelphia, Pa., for plaintiff.

Robert B. Simon, Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

## I. History of the Case

On May 4, 1954, plaintiff filed a complaint against defendants John and Margie Welker, husband and wife, alleging that he had given $12,500 to John Welker, trading as Supreme Motor Freight, in September of 1953 as his share of the purchase price of such defendant's business, with the understanding that if plaintiff's co-purchaser, Robert Holland, did not pay his share of $12,500 within a reasonable time, the agreement of sale which was signed at the time of the delivery of the above-mentioned $12,500 would be destroyed and the plaintiff's $12,500 would be returned to him. The complaint alleged further that John Welker wrongfully used the above-mentioned sum to pay off certain of his debts which had been secured by chattel mortgages on automobile trucks and, after releasing these trucks from the lien of the mortgages by such payments, had these trucks transferred into the name of his wife, Margie Welker, and also had valuable hauling contracts executed in her name to hinder, delay and defraud creditors. Defendants filed an answer, including a counterclaim, to the complaint in June 1954. In October 1954, plaintiff filed a petition (Document No. 6) for (1) a receiver of the assets in the possession of Margie Welker and belonging to her husband and (2) a preliminary injunction restraining Margie Welker from interfering with the assets of her husband, as well as directing her to account for and turn over to the receiver all assets of her husband's trucking business which she had received. As a settlement of the issues created by this petition, a letter stipulation dated November 15, 1954, was signed by counsel for the parties and by Margie Welker. This stipulation (Document No. 14) provided as follows:

"This letter is intended to confirm the arrangements which we made this morning in Judge Kirkpatrick's chambers.

"It is our agreement that in the event we obtain a judgment against John Welker, in the above entitled matter, the assets transferred to Margie Welker by John A. Welker, trading as Supreme Motor Freight, and the business conducted by her with the said assets, shall be liable for the payment of the said judgment with the same force and effect as though the judgment had been rendered against her personally.

"This Stipulation is in addition to and not in lieu of any other rights which the plaintiff may have against Margie Welker, asserted in the proceedings.

"The original of this letter, when signed by you and Mr. Bennett as counsel for Margie Welker and approved by Margie Welker, is to be filed in the United States District Court as a Stipulation."

The case was tried to a jury in January 1957. The verdict was in favor of the plaintiff in the amount of $12,500, with interest, on the complaint and also in favor of the plaintiff as defendant on the counterclaim. On January 23, 1957, judgment was entered on the verdict in favor of plaintiff and against John Welker in the amount of $15,013.10 (being $12,500 and interest of $2,513.10, computed at 6% from September 23, 1953, to January 23, 1957).

In this case, to determine the liability of Margie Welker,[1] post-trial depositions have been taken by the parties to determine the value of the assets transferred to her by her husband so that an appropriate judgment may be entered under the terms of the above stipulation. At a conference held with the hearing judge on November 4, 1958, it was agreed by counsel for both parties that the hearing judge was to determine "the liability of Margie Welker * * * on the basis of the record * * * in accordance with" the above-mentioned stipulation (see first sentence of last paragraph of

---

1. Where the term "defendant" is used, it refers to Margie Welker, who is the defendant in the issues now before the court.

Document No. 23). Requests for Findings of Fact and Conclusions of Law were filed in the winter of 1959; supplementary letters, with authorities, were received in 1959 on or about January 5, March 31, April 16, and April 20; and oral argument was heard on March 30, 1959.

## II. Findings of Fact

The hearing judge makes the following Findings of Fact:

1. John Welker, prior to February 1954, was the owner of a motor trucking business known as Supreme Motor Freight, operating such business as a common carrier subject to the regulations of the Interstate Commerce Commission.

2. For several years prior to February 1954, while he was operating his business, John Welker had a successful business relationship with a company known as Hammond Iron Works, from which he received for his hauling services in 1953 $28,940.73, and for the first five weeks in 1954 $3,823.21.

3. Margie Welker, John Welker's wife, actively assisted her husband in his business from about the middle of 1951 to February 1954 by supervising the bookkeeping, drawing and depositing checks, and generally participating in the operations of the company. She had knowledge of the negotiations and arrangements with Louis Winter and Robert Holland for the purchase of the business, as well as that plaintiff demanded in 1953 or 1954 repayment of his advance of $12,500.

4. Prior to her participation in the business of Supreme Motor Freight, Margie Welker had no experience or special skill in the trucking business.

5. On or about February 1, 1954, Margie Welker entered into the trucking business under the name M. Welker Truck Leasing, operating such business by renting trucks, without drivers, on a ton per mile basis, without restriction as to points of travel.

6. M. Welker Truck Leasing was located on the same premises (203 Bridgewater Road, Croyden, Pa.); and listed under the same telephone, as Supreme Motor Freight.

7. On February 1, 1954, M. Welker Truck Leasing entered into a contract with Hammond Iron Works, which was its first and, throughout its operation, its biggest customer.

8. This contract was renewed by the parties under substantially the same terms in 1955 and 1956.

9. On February 1, 1954, Supreme Motor Freight ceased doing business with Hammond Iron Works.

10. On or about February 1, 1954, Supreme Motor Freight transferred to M. Welker Truck Leasing, through certain finance companies and banks acting on the request of Supreme Motor Freight, three Brockway Tractor Trucks and three Dorsey Flat Semi-Trailers.

11. These six pieces of equipment were the first pieces of equipment owned by M. Welker Truck Leasing and were essential to its entering into the contract with Hammond Iron Works.

12. By the end of 1954, and throughout its operation, M. Welker Truck Leasing possessed other pieces of equipment with which it carried out its business.

13. The willingness of Hammond Iron Works to enter into a business relationship with M. Welker Truck Leasing was the result of Hammond's satisfactory business relationship with John Welker.

14. The value to M. Welker Truck Leasing of its relationship with Hammond Iron Works was the result of the efforts of John Welker.

15. The benefits received by M. Welker Truck Leasing through its relationship with Hammond Iron Works totaled $145,646.85, of which $70,920.93 was received in 1954, $57,238.67 in 1955, and $17,487.25 in 1956.

16. The net profit realized by M. Welker Truck Leasing was $14,725.82 in 1954, $8,342.32 in 1955, and $2,487.41 in 1956.

17. The value of the six pieces of equipment, at the time they were received by M. Welker Truck Leasing in February 1954 from Supreme Motor Freight totaled $11,779.97, itemized as follows:

| | |
|---|---|
| 1945 Brockway Tractor (#30) | $ 300.00 |
| 1951 Brockway Tractor (#34) | 3,592.70 |
| 1951 Brockway Tractor (#36) | 3,973.77 |
| 1951 Dorsey Trailer (#33) | 1,092.50 |
| 1952 Dorsey Trailer (#35) | 1,410.50 |
| 1952 Dorsey Trailer (#37) | 1,410.50 |
| Total | $11,779.97 |

18. The transfer by Supreme Motor Freight of its assets to M. Welker Truck Leasing was not supported by adequate or fair consideration.

19. The transfer by Supreme Motor Freight of its assets to M. Welker Truck Leasing was intended by John and Margie Welker to hinder and prevent plaintiff from making any recovery against John Welker for the $12,500 advance to which he claimed he was entitled.

20. Supreme Motor Freight ceased to do business around the end of 1955.

21. M. Welker Truck Leasing ceased to do business around the end of 1956, and at the present time has in its possession none of the equipment used in its business.

### III. Discussion

It is apparent that plaintiff bases his right to recover from Margie Welker the amount of his judgment against John Welker on two grounds: (1) the letter stipulation of November 15, 1954; and (2) the Uniform Fraudulent Conveyance Act, 39 P.S. § 351 et seq. Inasmuch as the value of the assets transferred is determinative of the ultimate liability of Margie Welker under each of the asserted grounds of recovery, this facet of the case will be discussed first. In so doing, it also will be necessary to discuss what is to be valued within the meaning of the letter stipulation and of the Uniform Fraudulent Conveyance Act.

#### A. Assets

There is no dispute between the parties that the six tangible pieces of equipment transferred by John Welker to his wife are to be considered in determining Margie Welker's liability. With regard to the value of these pieces at the time of the transfer in February 1954, the figures adopted by the hearing judge for all but the 1945 Brockway Tractor were those asserted by Margie Welker herself [2] (Deposition, 3/19/58, pp. 7-8, Document No. 22). This valuation is substantially supported, as to the tractors, by G. M. Edwards, credit manager of the Brockway Company about the time of the transfer (Deposition, 5/20/57, p. 41,[3] Document No. 32) and, as to the trailers, by defendant's expert, Damon A. Jopson (Deposition, 3/19/58, p. 49, Document No. 22). The figure of $300., adopted for the 1945 Brockway Trailer, was asserted by defendant's expert as representing the salvage value of that truck (Deposition, 3/19/58, p. 47, Document No. 22). Though Margie Welker

2. Defendant's Exhibits D-1 and D-2, assuming admissibility, are of little help on this issue of valuation.

3. The hearing judge has not overlooked defendant's counsel's letter of March 31, 1959, to the hearing judge, wherein at page 2 it is contended that the deponent's figure was quoted under a misapprehension. One of the tractors involved was acquired in March 1952, the other in November 1951 (Deposition, 5/20/57, pp. 25-6, Document No. 32). Assuming that deponent's estimate was made under a misapprehension, the resulting difference would appear to be inconsequential.

valued that truck at $102.60 (Deposition, 3/19/58, p. 6, Document No. 22), it is inconceivable that it could be worth less than its salvage value.

There is a dispute between the parties, however, as to the consideration of the contract between Hammond Iron Works and M. Welker Truck Leasing, and the benefits received therefrom, in determining the liability of Margie Welker. The record shows that John Welker had enjoyed a successful relationship with Hammond and that Margie Welker's ability to enter into the subsequent contract with Hammond and her success thereunder were the result of the efforts of John Welker (Exhibit A, attached to Document No. 24; Depositions: 8/19/57, pp. 24–28,[4] Document No. 33; 1/6/55, pp. 20–22, Document No. 30; 6/26/57, p. 14, Document No. 31). Under such circumstances, the contracts with Hammond and the benefits derived therefrom will be considered. See Hudson v. Wylie, 9 Cir., 1957, 242 F.2d 435; cf. Morgan's Home Equipment Corp. v. Martucci, 1957, 390 Pa. 618, 136 A.2d 838; Noerr Motor Freight v. Eastern Railroad Pres. Conf., D.C.E.D.Pa.1957, 155 F.Supp. 768, 810. Such is consistent with the letter stipulation, which subjects to payment by Margie Welker not only the assets but also "the business conducted by her with the said assets" transferred to her by her husband, and with the Uniform Fraudulent Conveyance Act, which contemplates the inclusion of intangible, as well as tangible, property in transfers in fraud of creditors (39 P.S. § 351). Defendant objects to the consideration of this item on the ground that, since John Welker was trading as a common carrier subject to the regulations of the Interstate Commerce Commission, whereas Margie Welker was merely hiring out trucks without drivers, there was nothing of value which passed from John Welker to Margie Welker concerning their respective relations with Hammond. However, a mere change in the form of conducting a business in circumstances such as these is of no significance. Gagnon v. Speback, 1957, 289 Pa. 17, 131 A.2d 619.

The contract with Hammond Iron Works benefited Margie Welker to the extent of $145,646.85 (Deposition, 6/26/57, pp. 7–8, Document No. 31, and plaintiff's Exhibit 8, attached thereto). This amount, plus the $11,779.97 representing the value of the three tractors and three trailers, constituted the total of the source from which Margie Welker would be required to satisfy plaintiff's judgment against John Welker under the letter stipulation and under the Uniform Fraudulent Conveyance Act.

B. *Liability under the Stipulation*

With regard to Margie Welker's liability under the letter stipulation reiterated above, defendant contends, first, that such stipulation should be interpreted to subject to liability only those assets for which she did not pay adequate consideration; second, that if such stipulation is not so interpreted, it should be set aside; and third, that such stipulation fails to provide for a judgment in personam against Margie Welker. None of these contentions can be sustained. It is well settled that where there is neither averment nor proof that anything was omitted from or added to an agreement by fraud, accident, or mistake, such agreement is to be construed exactly as written. Waldman v. Shoemaker, 1951, 367 Pa. 587, 80 A.2d 776. And in the absence of such averments and proofs, a stipulation signed by the parties and their attorneys cannot be set aside by the court. Buffington v. Buffington, 1954, 378 Pa. 149, 106 A.2d 229. As stated by the court in Gianni v. Russell & Co., Inc., 1924, 281 Pa. 320 at page 325, 126 A. 791, at page 792:

"* * * we propose to stand for the integrity of written contracts. * * *"

See, also, Mauch v. Pittsburgh Pension Board, 1956, 383 Pa. 448, 119 A.2d 193; Morse Boulger Destructor Co. v. Camden

---

4. The general evasiveness of this deponent must be considered in determining the meaning of his statements set forth in these pages.

Fibre Mills, 3 Cir., 1956, 239 F.2d 382. The record is void of proofs to justify setting aside the letter stipulation.[5] Also, it is clear that this agreement in no way qualifies the assets subject to liability as only those for which the defendant did not pay adequate consideration. Moreover, with reference to the last clause of the second paragraph, the agreement does provide for the assumption of personal liability by the defendant.

■ Defendant contends, further, that plaintiff cannot recover under the stipulation since he has not proved, within the meaning of the stipulation, what portion of the business of Margie Welker was conducted with the assets transferred to her by her husband. Not only should defendant be precluded from asserting this contention, since the information is in defendant's exclusive knowledge and she has prevented plaintiff from discovering it (Depositions: 1/6/55, pp. 35–40, Document No. 30; 3/19/58, pp. 20–30, Document No. 22), Besecker v. General Accept. Corp., 1940, 143 Pa. Super. 367, 17 A.2d 916, but, also, it is based on the erroneous assumption that "assets," within the meaning of the stipulation, refers only to the tangible assets—the six pieces of equipment. As indicated above, the total source from which Margie Welker may be required to pay plaintiff's claim can be determined to be clearly in excess of the amount of the judgment, with interest and costs.

■ The final question with respect to plaintiff's right to recover under the letter stipulation concerns the effect on the obligation of Margie Welker to discharge her husband's liability of the fact that she no longer operates a trucking business or owns any trucks or trailers. This question is to be determined in light of the meaning of the stipulation. The courts of Pennsylvania have held that contracts must receive a reasonable interpretation according to the intention of the parties and, to determine that intention, the court may consider the situation of the parties, the objects they apparently had in view, the nature of the subject matter of the agreement, and the surrounding circumstances. Foulke v. Miller, 1955, 381 Pa. 587, 112 A.2d 124; Betterman v. American Stores Co., 1951, 367 Pa. 193, 80 A. 2d 66; Mowry v. McWherter, 1950, 365 Pa. 232, 74 A.2d 154. At the time the stipulation was executed, Margie Welker was operating a trucking business and plaintiff's suit against her was pending. The plain meaning of the stipulation is that, in consideration for dropping this suit, Margie Welker would place herself in the same position as her husband, personally assuming any obligation he might be found to have to plaintiff, and that the assets transferred by him to her could be levied upon to discharge this liability. The fact that she may not now have certain of these assets cannot be asserted to relieve her of her basic responsibility. The following principle, adhered to by Chief Judge Kirkpatrick in Macdonald v. Winfield Corporation, D.C. E.D.Pa.1950, 93 F.Supp. 153, at page 157,[6] is applicable here:

"In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made, and to refrain from doing anything which will destroy or injure the other party's right to receive the fruits of the contract."

---

5. The first indication that defendant would assert these grounds to avoid liability under the stipulation was defendant's counsel's letter of November 7, 1958 (attached to Document No. 23) to the hearing judge. See, also, defendant's proposed Conclusions of Law (Document No. 28). These contentions are rejected in view of the record in this case. This stipulation would not be deprived of legal operation, even assuming a lack of consideration as contended by defendant. Restatement, Contracts, § 94.

6. Affirmed 3 Cir., 1951, 191 F.2d 32.

Therefore, under the letter stipulation, Margie Welker is at this time personally liable to plaintiff in the amount of his judgment against John Welker.

C. *Liability under the Uniform Fraudulent Conveyance Act*

With respect to Margie Welker's liability under the Uniform Fraudulent Conveyance Act, 39 P.S. § 351 et seq., particularly §§ 354–357, this is an appropriate case for the application of the rule that, where the husband is in debt at the time of the transfer to his wife, the burden is upon the wife to show by clear and satisfactory evidence, beyond that required of other creditors, that at the time of the transfer he was solvent or that she paid full consideration. Smith v. Arrell, 1957, 388 Pa. 117, 130 A.2d 167; Iscovitz v. Filderman, 1939, 334 Pa. 585, 6 A.2d 270;[7] Queen-Favorite Bldg. & Loan Ass'n v. Burstein, 1933, 310 Pa. 219, 165 A. 13; People's Savings & Dime Bank & Trust Co. v. Scott, 1931, 303 Pa. 294, 154 A. 489, 79 A.L.R. 129; In re Elliott, D.C.E.D. Pa.1948, 83 F.Supp. 771, affirmed Elliott v. McCann, 3 Cir., 1949, 173 F.2d 895. Margie Welker does not attempt to prove that her husband was solvent at or around the time of the transfer. Indeed, the indications are to the contrary (Deposition, 3/19/58, p. 14, Document No. 22). She does attempt to prove, however, that she paid adequate consideration for the assets transferred. To support this assertion 15 checks (defendant's Exhibits A–O, attached to Document No. 24) were placed in the record. These checks, it is contended, show payment over a seven-month period from March to September 1954 by Margie Welker to her husband for the six pieces of equipment transferred to her. The total amount of these checks is $9,878.35. Although Margie Welker testified that the total of the payments was $10,337.35, a $550 payment in the month of September does not appear to be in the record.[8] The total value of the trucks, as testified to by Margie Welker, was $12,582.60.[9] Of this amount, $6,356.60 was asserted to be due John Welker and $5,281.31 was asserted to be the amount of the obligation to the Brockway Company assumed by Margie Welker. The $944.69 excess of the alleged value over this alleged liability was explained to represent a payment in cash to the Brockway Company. The excess of the total sum of the checks over the amount alleged to have been due John Welker was explained as loans by Margie Welker to him (see Deposition, 3/19/58, pp. 9–14 and 34, Document No. 22).

This attempt to prove payment of adequate consideration, in light of the authorities, will not suffice. None of the checks reveal the purpose for which they were drawn. From the checks alone, therefore, it cannot be determined which ones represented payments for the trucks or which ones represented loans. The purported corroborating testimony of Margie Welker to explain this item is similarly not sufficiently persuasive (Deposition, 3/19/58, pp. 35–38, Document No. 22). The irregular amounts of the monthly payments and the remarkably slipshod method of bookkeeping are

---

7. The court in this case said at pages 589–590 of 334 Pa., at page 272 of 6 A.2d: "Since family collusion by a debtor is so easy to execute and so difficult to prove, the evidence to sustain the claim of the wife in such cases must be clear and satisfactory."

   See, also, American Trust Co. v. Kaufman, 1923, 276 Pa. 35, 39, 119 A. 749.

   These cases also show that the husband's use of a straw man in the transfer to his wife will not defeat his creditor's rights. Therefore, defendant's contention that the transfer to her was from the Brockway Company and not from her husband (Depositions: 1/6/55, pp. 11–12, Document No. 30; 5/20/57, p. 55, Document No. 32) cannot be sustained.

8. Margie Welker testified that the total payment in September 1954 was $1,050. However, the only check for September in evidence is defendant's Exhibit O for $500.

9. It is difficult to perceive how this exact figure was determined in view of the itemized evaluation of the equipment by Margie Welker.

additional factors negativing this proof. And, of course, this attempted proof of payment is based on the assumption that the only assets transferred by John Welker to Margie Welker were the three tractors and three trailers. Since the value of the Hammond contract must be considered in determining Margie Welker's total obligation to her husband, the proofs are grossly inadequate when this asset is included. 39 P.S. § 353.

■ In American Trust Co. v. Kaufman, 1923, 276 Pa. 35, at page 40, 119a 749, at page 751, it was said:

"It is in the interest of fair dealing and common honesty that transactions between husband and wife shall be scrutinized, where the husband is in debt and endeavors to put his property beyond his creditors' reach, and that the law shall by its processes aid in every possible way an inquiry into the good faith of the transaction. If a conveyance by a husband to a wife is in good faith for a valuable consideration passing from her to him, she has adequate remedies both in law and in equity to protect herself: (citing cases)."

All the evidence offered by defendant on the issues of good faith and adequate consideration has been considered.[10] However, not only does the record as thus completed fail to support defendant's claim of payment of adequate consideration, but also it reveals on the part of both John and Margie Welker an actual intent to defraud plaintiff beyond the actual intent found by failure of the wife

to produce sufficient evidence to prove adequate consideration for the property transferred.[11] Particular note must be made of the manner in which this transaction was handled, as discussed above, and the opportune unavailability of any definite records concerning it and the respective businesses in general (for example, Deposition, 3/19/58, pp. 22–30, Document No. 22). The facts that Margie Welker had the power to draw checks from and deposit checks in her husband's business account (Depositions: 1/6/55, pp. 17–18, 29–30, Document No. 30; 5/20/57, pp. 51–52, Document No. 32; 8/19/57, p. 34, Document No. 33), and that she and her husband used the same bank and occupied the same residence in the operation of their respective businesses (Depositions: 3/19/58, pp. 18, 31, Document No. 22; 1/6/55, p. 41, Document No. 30) are also significant. In addition, the overall evasiveness of these two persons, evident in their depositions and in the record of the trial to a jury, and the judgment of the jury as to the character of their testimony in that trial, as revealed by the verdict, have been considered. Under all the evidence, the hearing judge concludes that this transfer was fraudulent as to plaintiff within the meaning of the Uniform Fraudulent Conveyance Act.

■ Although Margie Welker no longer operates a trucking business nor has in her possession any of the equipment transferred to her, plaintiff is entitled to proceed against the wife individually under the Pennsylvania cases involving proceedings under 39 P.S. § 359. In Toff v. Vlahakis, 1955, 380 Pa.

10. It is not necessary to determine the admissibility of the evidence offered by defendant which was objected to by plaintiff (see plaintiff's Supplemental Requests for Conclusions of Law, Document No. 26), since these Findings and Conclusions have been made after consideration of all the evidence offered by defendant. However, plaintiff's objections appear to be well taken as to the introduction of the checks (defendant's Exhibits A–O), cf. Heiser v. Reynolds, 1919, 263 Pa. 434, 437, 106 A. 888, in addition to the authorities cited by plaintiff, and as to de-

fendant's Exhibits D–1 and D–2 and defendant's testimony thereon, cf. Royal Pioneer Paper Box Mfg. Co. v. Louis DeJonge & Co., 1955, 179 Pa.Super. 155, 115 A.2d 837; see, also, footnote 2.

11. The cases hold that actual intent within the meaning of § 7 of the Act, 39 P.S. § 357, as distinguished from intent presumed in law, is shown where the transfer from husband to wife was for nominal consideration. Iscovitz v. Filderman, supra; Queen-Favorite Bldg. & Loan Ass'n v. Burstein, supra.

512, 112 A.2d 340, the court found the husband's endorsement to his wife of checks drawn to his order to be in fraud of creditors. The wife's subsequent dissipation of this money, allegedly for the benefit of her ill husband, was held to be no bar to plaintiff's right to recover from her individually. The court said, 380 Pa. at page 519, 112 A.2d at page 343:

> "Being aware of her husband's insolvency, when she accepted and cashed the two checks, she should also have realized that the assets she had so received inured to the benefit of her husband's existing creditors and not to him personally."

In the present case, the hearing judge has found that Margie Welker knew, and intended, that the transfer involved here was made for the purpose of hindering and defrauding plaintiff. Therefore, the fact that she may have dissipated the assets is of no consequence. She is personally liable to satisfy plaintiff's judgment against her husband.[12]

### IV. Conclusions of Law

The hearing judge makes the following Conclusions of Law:

1. The court has jurisdiction of the parties and the subject matter.

2. The six pieces of equipment transferred by John Welker to Margie Welker and the value of the contract entered into by Margie Welker with Hammond Iron Works constitute assets transferred to her by her husband out of which she could have satisfied her husband's liability to plaintiff.

3. The total value of the assets described in Conclusion of Law 2 exceeds $150,000 and is, therefore, sufficiently adequate to satisfy plaintiff's claim of $15,013.10, with interest at 6% from January 23, 1957, and costs.

4. The letter stipulation entered into by Margie Welker on November 15, 1954, is a valid contract.

5. Margie Welker is individually liable to plaintiff under the letter stipulation of November 15, 1954, for the amount of plaintiff's claim against John Welker, as described in Conclusion of Law 3.

6. Margie Welker has failed to sustain her burden to prove payment of adequate consideration not only for the six pieces of equipment transferred to her by her husband but also for the total of the assets transferred to her by her husband.

7. The transfer of assets by John Welker to Margie Welker was intended by them to hinder and prevent plaintiff from recovering his judgment against John Welker and was in fraud of plaintiff within the meaning of the Uniform Fraudulent Conveyance Act.

8. Margie Welker is individually liable to plaintiff by reason of this fraudulent transfer for the amount of plaintiff's above-described claim against John Welker.

9. Paragraphs 5 to 10 of plaintiff's Requests for Conclusions of Law are adopted as Conclusions of Law of the hearing judge, provided that the fifth and sixth lines of paragraph 5 shall be modified to read as follows:

"of the assets so transferred should be liable for the payment of any judgment entered in this proceeding in favor of Louis K. Win-"

All Requests for Findings of Fact and Conclusions of Law which are inconsistent with the foregoing are denied.

### Order

And now, June 29, 1959, based on the foregoing History of the Case, Findings of Fact, Discussion and Conclusions of Law, it is ordered that (1) judgment be entered in favor of plaintiff, Louis G. Winter, and against defendants, Margie Welker and John A. Welker, individually, jointly, and as tenants by the entireties, Margie Welker, trading as M. Welker Truck Leasing, and John A. Welker, trading as Supreme Motor Freight, in the amount of $15,013.10 with interest at 6% from January 23, 1957, and costs; and (2) the judgment entered against John A. Welker on January 23, 1957, is superseded and revoked by this order.

12. See, also, Restatement, Restitution, §§ 128 and 138.