**In re Gi and Yeong NAM, Debtors.**

**Marvin Krasny, Plaintiff,**

**v.**

**Gi Nam and Yeong Nam, Defendants.**

**Bankruptcy No. 99–16565DWS.**
**Adversary No. 99–0429.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 20, 2000.

the claims of the general unsecured creditors. 4 Collier on Bankruptcy at ¶ 510.04.

Eric L. Frank, Philadelphia, PA, for Defendants.

Steven M. Schain, Philadelphia, PA, for Plaintiff, Chapter 7 Trustee.

Marvin Krasny, Philadelphia, PA, Chapter 7 Trustee.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, United States Trustee.

### MEMORANDUM OPINION

DIANE WEISS SIGMUND,
Bankruptcy Judge.

■ Before the Court is the Complaint ("Complaint") of plaintiff, Marvin Krasny ("Trustee"), who is the Chapter 7 Trustee in the underlying bankruptcy case, against debtor, Gi Nam ("Debtor"), and his wife, Yeong Nam ("Mrs. Nam") (Debtor and Mrs. Nam shall be referred to collectively hereinafter as the "Defendants").[1] The Trustee seeks to have transfers made by Debtor and/or Debtor and his wife avoided

---

1. Also before the Court is the Trustee's Objections to Debtor Gi Nam's Claim of Exemptions ("Objection"). In the Objection, the Trustee asserts the following:

> 1. The debtor is not entitled to the amount claimed as exempt pursuant to 11 U.S.C. § 522(d)(1), as the amount exempted by the debtor exceeds the amount allowed by 11 U.S.C. § 522(d)(1).
>
> 2. The debtor is not entitled to exempt his portion of the entireties property from the estate, as a subsequent judgment against both husband and wife in the adversarial fraudulent conveyance action would attach to the entireties property.

Objection at ¶¶ 1–2. The Objection was continued until the trial of the adversary proceeding because the Trustee's second argument regarding the Debtor's exemption of entireties property was based on the Trustee successfully obtaining a judgment in the adversary proceeding against both husband and wife.

The Trustee has never provided any authority to support his position. In the parties' Joint Pretrial Statement, he merely restated the arguments in conclusory fashion. In his pretrial memorandum, the Trustee made a one sentence reference to the arguments, but again, provided no discussion of them. At trial, I reminded the parties that the Objection was still at issue and asked them not to lose sight of it, but the Trustee never made any argument related to the Objection.

Upon consideration of the Objection, I deny it. A review of Debtor's Schedules reveals that Debtor did not elect the exemptions available under 11 U.S.C. § 522(d). Therefore, the amount allowed by § 522(d)(1) is irrelevant to Debtor's claimed exemptions. As to the second argument raised in the objection, this adversary proceeding was not filed until approximately one month after the Debtor's bankruptcy case was commenced. As I previously stated in *In re Kollar,* 218 B.R. 349 (Bankr.E.D.Pa.), *aff'd,* 223 B.R. 288 (E.D. Pa.1998), *aff'd,* 176 F.3d 175 (3d Cir.1999), "[t]he commencement of a case under title 11 is the point in time when a debtor's estate is created, 11 U.S.C. § 541(a), and when the exemptions from that estate are determined." *Id.* at 352 (citations omitted). The Trustee has provided no reason to deviate from the general rule and no authority to support doing so. Therefore, I also reject his second argument.

as fraudulent transfers based on: (i) 11 U.S.C. § 544(b), in conjunction with the Pennsylvania Uniform Fraudulent Transfer Act ("UFTA"), 12 Pa.C.S.A. §§ 5101 *et seq.;* and (ii) 11 U.S.C. § 548(a)(1). After trial of the Complaint, I grant judgment in favor of the Trustee and against the Defendants.

## BACKGROUND[2]

Defendants are originally from Korea. While in Korea, Debtor graduated from high school and received an associate degree in textile and mechanical engineering. Uncontested Fact ¶ 5. From June 1983 through the present, Debtor has worked at Standard Terry Mills ("STM"). *Id.* ¶ 8. This company, which employs between 75–100 people, manufactures textile products such as kitchen towels and potholders. *Id.* ¶ 9. Debtor began working at STM as a "loom fixer," at a salary of $500.00 per week. *Id.* ¶ 10. In December of 1984, he was promoted to "plant manager" at a salary of $552.89 per week. *Id.* In approximately 1994 or 1995, Debtor was promoted to STM's "Vice President of Production." *Id.* His duties in this position include design, production, scheduling, shipping, purchasing of materials and hiring and firing employees. *Id.* ¶ 14. As of May, 1999, Debtor's annual salary was $84,940.30. *Id.* ¶ 11.

Mrs. Nam speaks and reads Korean, *id.* ¶ 6, but she is unable to read English and has a limited ability to speak it. After coming to the United States, Mrs. Nam worked as a machine setup operator at a company called Stabilus for approximately 21 or 22 years. *Id.* ¶ 15. Her employment at this company ended when it closed its plant and left the region. *Id.* Since May of 1999, she has been working at STM as a machine operator earning $11.00 per hour. *Id.* ¶ 16.

Debtor manages his household's banking and investing. *Id.* ¶ 17. In this regard, he has opened and administered accounts with Union National Bank, Harleysville National Bank and Trust Company ("HNB") and Prime Bank. *Id.* He has also invested in certificates of deposit which he has rolled over to obtain more favorable rates of interest. *Id.* For twenty years, Defendants have maintained a joint account (the "Joint Account") at HNB.

On January 18, 1997, Defendants' son, David Nam, was arrested. *Id.* ¶ 19. Shortly thereafter, he called his father. *Id.* ¶ 19. After receiving this call, Debtor retained attorneys Val Wilson ("Wilson") and Arnold Silverstein ("Silverstein") to defend his son. *Id.* ¶ 20.

Debtor borrowed $20,000 from his employer, STM, to pay for his son's legal representation. He signed a note dated March 27, 1997, promising to repay the loan to STM. Exhibit P–2. To date, the loan has not been repaid. *See* Exhibit P–30, Schedule F at 3 (listing $22,500 loan to STM for "March 27, 1997 personal loan used for expenses related to son's legal costs."). In total, Debtor paid $50,000 to Wilson and Silverstein for their representation of his son.

At his arraignment, David Nam was charged with several criminal offenses including murder, robbery and burglary. Undisputed Facts ¶ 21. On May 22, 1998, a bail hearing was held. Wilson testified that, while he could not recall the exact words he used, he conveyed to Debtor prior to the bail hearing that: (i) he thought the bail request would be denied; (ii) if it were granted, Debtor would be required to post ten percent of the bail; and (iii) if Debtor posted bail for his son and his son fled, Debtor "would be in

**2.** The facts set forth in this section are based on the Statement of Uncontested Facts (hereinafter referred to as "Uncontested Facts") contained in the parties' Joint Pretrial Statement and/or the evidence introduced at trial.

References to the uncontested facts are noted. References to the testimony of the Defendants' expert witness, Stephen Scherf, are also provided from the trial transcript.

trouble." Debtor could not recollect any such conversation with Wilson.

Through Debtor's efforts, twenty or thirty members of his church attended David Nam's bail hearing with the Defendants. *Id.* ¶ 23. At the completion of the bail hearing, the Court set bail in the amount of $1 million. *Id.* ¶ 24. According to Silverstein, based on his usual course of conduct, he would have explained to Debtor, immediately following the bail hearing, that he was only required to post $100,000 to obtain his son's release, but that he would be liable for the entire $1 million in bail if his son "skipped bail." Debtor denies having any conversation with Silverstein after the bail hearing and denies that such a conversation regarding the bail ever occurred. According to Debtor, while he was in court for the bail hearing, he was in the back of the courtroom and unable to hear what was happening.[3] When the proceeding ended, one of the church members who attended the hearing with the Debtor told him that he had to pay $100,000 so that his son could go home.

Between May 22, 1997 and January 12, 1998, Debtor amassed the $100,000 needed to obtain his son's release on bail. *Id.* ¶ 25. Almost all of the Defendants' holdings, including $15,000 which Mrs. Nam had placed in a Korean investment vehicle called a "kae," were liquidated in an effort to collect the $100,000. *Id.* ¶¶ 25, 34.

On or about January 12, 1998, Debtor personally brought a certified check in the amount of $100,000 to the Clerk of the Quarter Sessions in Philadelphia to obtain his son's release from jail. *Id.* ¶ 26. Simultaneously with the $100,000 payment, Debtor signed a Certification of Bail and Discharge ("Bail Surety Agreement") dated January 12, 1998. *Id.* ¶ 27. *See also* Exhibit P–4. The terms of the Bail Surety

Agreement set forth that the surety is liable for the $1 million bail and all conditions imposed by the agreement. Undisputed Facts ¶ 28. After paying the $100,000 and signing the Bail Surety Agreement, Debtor received a copy of the Bail Surety Agreement which he kept. *Id.* ¶ 29. According to Debtor, he did not have a thorough understanding of the Bail Surety Agreement because he did not know that he could be held liable for $1 million. Rather, he thought that if his son failed to appear for court, the penalty that would be imposed against him would be the loss of the $100,000 which he had posted for his son's release.

David Nam was released from prison on or about January 15, 1998. *Id.* ¶ 31. On March 12, 1998, he failed to show up at a pre-trial status listing in criminal court and a bench warrant was issued for his arrest. *Id.* ¶ 31. As a result of David Nam's failure to appear, a judgment (the "Bail Judgment") for $1,000,018.50 was entered against Debtor on April 6, 1998. *Id.* ¶ 33. A notice of the Bail Judgment was mailed to Debtor's address. Exhibit P–6.

On June 15, 1998, Debtor assisted Mrs. Nam in opening a savings account ("Sole Account") at United National Bank. Undisputed Facts ¶ 34. Defendants established this account for Mrs. Nam's exclusive use because family monies, including Mrs. Nam's "kae" investment, had been depleted to fund the $100,000 bail deposit for their son and Mrs. Nam wanted her own money. *Id.*

Although in the past Debtor had generally deposited his paycheck into the Joint Account at HNB, between August 14, 1998 and November 13, 1998, Mr. Nam deposited seven (7) paychecks totaling $7,496.91 in Mrs. Nam's Sole Account. *Id.* ¶ 35.

---

**3.** When Debtor took the witness stand at the trial of the instant adversary proceeding, he apologized after the few first questions, stating that he has a hearing problem which he attributes to the fact that his place of employment is very noisy and, consequently, that he was having difficulty hearing counsel's questions. Fortunately, the Court has a hearing device for witnesses that remedied this problem for the Debtor. Nevertheless, the episode, which did not appear rehearsed or planned, lent credibility to Debtor's testimony that he could not hear what was happening at the bail hearing.

*See also* Exhibits P–7 through P–13. Both of the Defendants endorsed these checks before they were deposited in the Sole Account. Undisputed Facts ¶ 36. According to the Debtor, he deposited these paychecks in the Sole Account in response to his wife's complaints that all of her money was used to fund the $100,000 in bail for their son.

On November 28, 1998, Debtor wrote a check to Prime Bank for $1,517.74. He deposited the check into his wife's Sole Account. Exhibit P–14. According to the notation on the bank statement from HNB, this check cleared the Joint Account on December 1, 1998. *Id.* While Debtor could not specifically recollect the reason for depositing this check in the Sole Account, he explained that Mrs. Nam shopped for household items on Fridays and sometimes she would use her own money. When this occurred, she would demand that he repay her for it. He also reiterated how Mrs. Nam kept complaining that her money had been used to fund the $100,000 bail.

Between June 15, 1998 and November 30, 1998, four certificates of deposit (referred to interchangeably as the "Prime Bank CDs" or "CDs") were opened with Prime Bank to be held as "Yeong Nam in trust for Gi Nam." *Id.* ¶ 37. *See also* Exhibits P–25 through P–28.[4] According to Mrs. Nam, she wanted to open the certificates of deposit at Prime Bank because it was located close to the Defendants' home. Debtor assisted Mrs. Nam in obtaining the Prime Bank CDs because of her inability to speak English and because she depends upon his expertise in banking matters. Undisputed Facts ¶ 38. At the bank, Defendants were advised that if the certificates of deposit were placed in Mrs. Nam's name only, it would make it more difficult upon her death to liquidate them. It was suggested to Defendants

that Mrs. Nam put one of her family member's names on the certificates. She chose to put Debtor's name on them. The opening dates, amounts and maturity dates for the certificates of deposit are listed below:

| Opening Date | Amount | Maturity Date |
|---|---|---|
| June 15, 1998 | $10,000 | December 15, 1998 |
| July 9, 1998 | $10,000 | March 9, 1999 |
| October 12, 1998 | $ 5,000 | April 12, 1999 |
| November 30, 1998 | $10,000 | March 30, 1999 |

*Id.* ¶ 43.

On January 21, 1999, the City of Philadelphia began executing on its Bail Judgment by, *inter alia,* serving execution discovery on Mr. Nam and his garnishees, employer STM, and the banks with which he dealt, namely Prime Bank and HNB. *Id.* ¶ 39. On January 25, 1999, the Sheriff served Prime Bank with execution materials and, in a letter dated January 25, 1999, HNB informed Mr. Nam that his accounts had been frozen. *Id.* ¶ 40. *See also* Exhibits P–17, P–18. On February 4, 1999, the Sheriff served Debtor with the execution materials and on March 3, 1999, the Sheriff "levied" (*i.e.,* entered the Defendants' home, inventoried the contents and generated a list or property to be sold at a Sheriff's sale) on the personal property in Defendants' home. Undisputed Facts ¶ 41. *See also* Exhibits P–19, P–21.

On March 4, 1999, the four Prime Bank CD's were liquidated. Undisputed Facts ¶ 42. The liquidation values of the four CDs, in the chronological order of their purchase dates, were $10,264.76, $10,213, $5,033.69 and $10,088.25. *Id.* ¶ 43. On the same date, Debtor also borrowed $10,000 from one of the individuals whom he supervised at STM. Debtor signed a form Promissory Note, which Debtor purchased at a store, to formalize the transaction. Exhibit P–22. Later on the same date, Defendants traveled to South Korea where they stayed for three weeks. Exhibit P–32 at 8–10. According to Debtor, this trip

---

4. Exhibits P–25 through P–28 are incomplete copies of the writings memorializing the Prime Bank CDs. All four of the writings refer to a "reverse side" which was not included in the exhibits. Significantly, neither of the parties made reference at trial nor in any of their written motions, responses or memorandum to any of the language in these writings.

was made because their son had turned himself into the police in South Korea and they wanted to find out what was happening. *Id.* at 8. In April of 1999, Defendants made another trip to Korea, but this time they only stayed for a week. *Id.* at 8–10. During these trips to Korea, Mrs. Nam gave money to Debtor's mother as a gift and paid over $10,000 to an attorney to represent David Nam. *Id.* at 16–19.

On May 19, 1999, Debtor filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. On June 11, 1999, the Trustee commenced this adversary proceeding by filing the Complaint which consists of two counts. Count I is based on 11 U.S.C. § 548(a)(1) and alleges that within one year before filing his bankruptcy case, Debtor "transferred assets for the purpose of hindering, delaying or defrauding creditors including the City." Complaint ¶ 21. Count II is based on 11 U.S.C. § 544(a) and the UFTA. In this Count, the Trustee asserts that Debtor and his wife made transfers of Debtor's assets, without adequate consideration, in order to defraud the City and prevent it from recovering on the Judgment. *Id.* at ¶ 27–32.

At the trial of this matter, six witnesses testified: Defendants, Joan Barron–Fauser ("Barron–Fauser"), Silverstein, Wilson and Defendants' expert, Stephen Scherf. Defendants testified generally to the events summarized above and to their states of mind when relevant. When questioned regarding their disposition of the funds from the Prime Bank CDs and whether they spent money in Korea to provide for their son, they repeatedly invoked their Fifth Amendment right against self-incrimination.

Barron–Fauser, who is the Senior Supervisor in the Pretrial Services Division of the 1st Judicial District of Philadelphia, testified regarding the forms that are used in bail matters and explained that it is the course of conduct of her office to send copies of a bail judgment to the surety at the address which he or she gave when entering into the bail surety agreement. Silverstein and Wilson testified regarding conversations which they had or may have had with Debtor during which they explained to him that he could be held liable for the entire amount of bail set for his son if he failed to appear as required.

Scherf testified on behalf of Defendants as an expert in the area of forensic accounting and, specifically, on the issue of tracing of funds.[5] Transcript, dated November 1, 2000 ("Transcript"), at 3. On direct examination, he explained that he was engaged by Defendants to determine the source and origin of the funds used to obtain the Prime Bank CDs. *Id.* at 16. To enable him to perform this analysis, Defendants provided him with certain documents[6] and advised him of the following:

---

5. The Trustee filed a Motion in Limine to Preclude Testimony of Stephen J. Scherf which was denied.

6. Scherf identified the documents which he was provided in his report as follows:
- Adversary Complaint Number 99–429 in Re: Gi Nam
- Defendants' answers to Plaintiffs' interrogatories
- Plaintiff's requests for production of documents of defendants Gi Nam
- Plaintiff's response to defendants' request for the production of documents
- Defendants' discovery documents
- Information received from First USA Bank, N.A.
- Information received from The GM Card

- 1998 U.S. Individual Income Tax Return for Gi Yeong Nam and Yeong N. Nam
- Union National Bank statements for Yeong N. Nam, account number 102116456 from May, 1999 through August 27, 1999 and related documents
- Prime Bank Certificates of Deposits and transaction history
- Union National Bank and Trust Company statements for Gi Yeong Nam or Yeong Nam Nam, account number 0911–65151 from June 19, 1995 through August 20, 1996 and related documents
- Harleysville National Bank and Trust Company statements for Gi Yeong Nam or Yeong Nam Nam, account number 06–0832386 from November 19, 1996 through August 16, 1999 and related documents

[I]n mid–1988, Mrs. Nam's employment with Stadlus terminated when the company moved its operations to North Carolina.[7] The company paid Mrs. Nam severance of 16 weeks pay plus unused vacation time. These funds plus a few uncashed paychecks were used to purchase the June 15, 1998 CD.... [T]he July 15, 1998 CD was purchased with funds from an IRA distribution and several unemployment checks that Mrs. Nam received... [T]he October 12, 1998 CD was purchased with a $2561.00 withdrawal form Mrs. Nam's account at Prime Bank and several unemployment checks. Finally, ...the November 30, 1998 CD was purchased with a pension fund distribution and a $6,000 withdrawal from Mrs. Nam's account at Prime Bank.

Exhibit D–1, at 2.

Based on the documentation provided to him, Scherf concluded that documents

●Prime Bank statements for Yeong Nam Nam, account number 0341012003 from June 15, 1998 through April 12, 1999.
Exhibit D–2, at 2.

7. In Scherf's report, he refers to Mrs. Nam's former employer as "Stadlus"; the parties, in their Uncontested Facts, refer to it as "Stabilus." *Compare* Exhibit D–1 *with* Joint Facts ¶ 12.

8. On direct examination, Scherf was questioned about the methodology he used in rendering his opinion:

Q. Now without telling us what conclusions you drew, was the documentation that you reviewed and the information made available to you sufficient to enable you to form an opinion about the source of the fund with respect to the Prime Bank CD?

A. With respect to the Prime Bank CDs, the underlying deposit documents as to what actual cash went into those CDs was not in the discovery documents. It was requested and it doesn't seem to exist. So then I had to look to other sources of documents to determine what the nature of those funds were. Because you couldn't tell with absolute certainty what those funds were[,] you had to look at what other activity occurred in the other accounts, what other information existed with respect to the tax records,

which reveal the actual source of the funds used to obtain the Prime Bank CDs do not exist. *Id.* at 19, 35. However, by reviewing other supporting documents, he was able to form an opinion within a reasonable degree of professional certainty about the source of the funds used to obtain the CDs.[8] *Id.* at 19–21, 35–36.

As part of his analysis in determining the source of the Prime Bank CDs, Scherf reviewed the bank statements for Mrs. Nam's Sole Account from the commencement of the account through April 12, 1999 as well as statements from the Joint Account at HNB. *Id.* at 36–39. He observed that prior to the two withdrawals which Defendants assert were used to fund part of the third and fourth Prime Bank CDs, approximately $9,375.00 was deposited in Mrs. Nam's Sole Account from the following sources: (i) an initial cash deposit of $1,486; (ii) $7,531 in paychecks from Debtor;[9] and (iii) a $319 check to Mrs.

etc. to determine what the potential sources of those funds would be.

Q. Now can you be a little more specific about the methodology on what you've just described, how you can go from looking at these other documents to forming an opinion regarding the source of the CDs?

A. Yes. One thing that one does in trying to do that is to essentially look at the time lines and look, for example, when the CDs or certificates of deposit were opened to determine if there were other sources of transactions that occurred in or around the same time that would result in, for example, a transfer of funds from one account to another account. And you can determine whether that occurred, because that would indicate that a source of the CDs could be a withdrawal from another account or some other source of funds coming in; so that's exactly what I did. I looked at the discovery of documents to determine whether those items existed and, you know, correlated those to what I have been told the facts were in the case, to determine if that made sense.

Transcript at 19–20.

9. The Trustee presented documentary evidence showing that the seven paychecks from Debtor that were deposited into Mrs. Nam's

Nam.[10] *Id.* at 37–39. He was unable to determine the source of the initial $1,486 deposit. *Id.* at 37.

With regard to Defendants' Joint Account, Scherf reviewed statements for the period beginning November 19, 1996 through August 16, 1999. Exhibit D–1 at 2. *See also* Transcript at 21–22. He concluded that the Joint Account was essentially used to pay household expenditures including the Defendants' mortgage and that generally Mr. Nam's paychecks were deposited into the account. *Id.* at 39. Elaborating on this point, Scherf stated:

> You'll see that the deposits and the withdrawals are primarily the same on a monthly basis, with the exception of, Mr. and Mrs. Nam had certain CDs that would mature; they had some CDs at Mainline Bank and other banks that a CD would mature, they would put the money into the joint account, and then eventually move it out into another CD. So it kind of went in and went out.
>
> And if you exclude those transactions and if you exclude the accumulation of funds for the $100,000, you see essentially an ongoing deposits into the account of paychecks and payment of household bills are consistent, if you exclude those couple blip transactions for the certificates of deposit.

*Id.* at 40. *See also* Exhibit A (historical analysis which Scherf prepared of the Joint Account) to Exhibit D–1.

As indicated above, with regard to the first certificate of deposit purchased on June 15, 1998, Scherf was told by Defendants that Mrs. Nam used her severance pay and unused vacation time from Stadlus as well as a few uncashed paychecks to obtain the CD. Transcript at 41. While precise documentation of these amounts was not available, Scherf noted that Yeong Nam's W–2 for 1998 indicated that she

received gross pay of $30,000 with $22,000 available to her after taxes. *Id.* at 42. Based on this documentation, he concluded that Yeong Nam would have had $10,000 available to her from her sole funds to purchase the first CD. *Id.*

As for the second CD purchased on July 9, 1998, Defendants represented that the funds used to obtain this CD came from two sources: (i) an IRA distribution to Mrs. Nam; and (ii) her unemployment checks. *Id.* at 43. Based on the documentation which Scherf reviewed, he concluded that Defendants' representations regarding the sources of this second CD were plausible. Scherf noted that Mrs. Nam received an IRA distribution in the amount of $8,388.77 via a check that was issued on July 1, 1998 which was eight days before the CD was obtained. *Id.* Consequently, he found that it was reasonable that these funds were a source of the CD. *Id.* Also, Mrs. Nam received $7,975 net of taxes in unemployment compensation for 1998. *Id.* at 44. Accordingly, she would have sufficient funds available to her from her unemployment compensation to pay the balance of the $10,000 CD ($10,000–$8,388.77 =$1,611.23). *Id.*

According to Defendants, the source of funds for the third CD obtained on October 12, 1998 for $5,000 was: (i) a $2,561 withdrawal from Yeong Nam's Sole Account; and (ii) several unemployment checks. *Id.* at 44. Scherf located documentation which confirmed that a $2,561.00 withdrawal occurred on October 12, 1988 from the Sole Account. *Id.* at 44–45. He also noted that since he had accounted for only $1,611 out of $7,975 in unemployment compensation available to Mrs. Nam, it was reasonable that she had used her unemployment compensation to pay the balance ($2,439.00) of the $5,000 for the CD. *Id.*

Sole Account total $7,496.91 as the parties set forth in ¶ 35 of the Undisputed Facts.

**10.** Significantly, Scherf did not conclude that the check for $1,517.74, which Debtor signed

on November 28, 1998 and made payable to Prime Bank, was deposited into the Sole Account prior to the two withdrawals therefrom for the Prime Bank CDs.

With respect to the fourth CD purchased on November 30, 1998 in the amount of $10,000, Defendants represented that it was obtained with a pension fund distribution to Mrs. Nam and a $6,000 withdrawal from Mrs. Nam's Sole Account. *Id.* at 45–46. Scherf found documentation that confirmed that Mrs. Nam received a pension distribution of $3,730.75 in November, 1998 and that $6,000 from Mrs. Nam's sole account was moved over to the CD. *Id.* at 46. As for the remaining $270 making up the $10,000 CD, he found no explanation for the source. *Id.*

Based on the foregoing analysis, Scherf testified, on direct examination, that in his professional opinion, except for $7,531 in funds from Debtor's paychecks that were deposited into Mrs. Nam's Sole Account and the $270 in funds, the source of which he could not identify, Mrs. Nam used her sole funds to obtain the Prime Bank CDs. *Id.* at 46–47. When questioned on cross-examination, Scherf admitted that he was unaware of whether Defendants had a safe or otherwise stored cash in their house that could have been the source of the funds used to obtain the Prime Bank CDs and admitted that did not interview the Defendants in conjunction with his review. *Id.* at 52. He also admitted that he could not state with absolute certainty that the sources of the Prime Bank CDs were as Defendants represented, but could only state that their explanations were possible and reasonable given the supporting documentation available to him. *Id.* at 56. *See also id.* at 20–21 (testifying that because cash is fungible he could not identify with absolute certainty the source of the funds for the Prime Bank CDs, but that he was able to render an opinion within a reasonable degree of professional certainty regarding the sources of the Prime Bank CDs).

In his pretrial memorandum and at trial, the Trustee argued that the following transfers are fraudulent under the Pennsylvania Uniform Fraudulent Transfer Act and § 548(a)(1) of the Bankruptcy Code:

(i) the deposit by Mr. Nam of $7,496.91 paychecks into Mrs. Nam's Sole Account;

(ii) the deposit by Mr. Nam of the check in the amount of $1,517.74 into Mrs. Nam's Sole Account;

(iii) the conveyance of funds into and out of the Prime Bank CDs.

Plaintiff[']s Pretrial Memorandum ("Trustee's Memorandum") at 5–7. Relying upon Code §§ 544(b) and 548(a)(1), he seeks to have the transfers, totaling $44,613.61 ($7,496.91 + $1,517.74 + $35,599.70), avoided.

With regard to the transfers involving the Prime Bank CDs, the Trustee contends that Debtor's funds were used to purchase these CDs. In the alternative, he argues that even if Mrs. Nam's sole funds were used to purchase the CDs, Debtor obtained an interest in them when Mrs. Nam titled them "Yeong Nam in trust for Gi Nam." In either case, he contends that the funds from the liquidated CDs belonged to the Debtor.[11]

Responding to the Trustee's arguments, Defendants contend that Debtor's deposit of his paychecks and the $1,517 into Mrs. Nam's accounts were not fraudulent because the transfers were not made with the "intent to delay or hinder creditors." Defendants' Trial Memorandum of Law in Opposition to Plaintiffs' Motions in Limine ("Defendants' Memorandum") at 4–5. Defendants also contend that the transfers of funds into and out of the Prime Bank CDs were not fraudulent because: (i) the majority of funds used to purchase the CDs was "derived from Mrs. Nam's separate and solely owned assets," *id.* at 5; and (ii)

---

11. The Trustee further argues that an adverse inference should be drawn against the Defendants based on their invocation of the Fifth Amendment right against self-incrimination to questions regarding the disposition of the Prime Bank CD funds. Because of my disposition regarding the Trustee's other arguments, I find it unnecessary to address this issue.

the titling by Mrs. Nam of the certificates in her name, in trust for the Debtor, created "totten trusts" which did not vest any current ownership rights in the Debtor. Defendants further argue that to the extent any of the transfers are declared fraudulent, the Trustee's maximum recovery is $35,588.70 and not $44,613.61 because the "Trustee's two theories overlap." On this point, Defendants assert:

> [T]he Trustee alleges that the Debtor's deposits into Mrs. Nam's sole account should be set aside. Those same monies from Mrs. Nam's account were later used to purchase the CDs. If the CD transaction can be set aside, there is no reason to also set aside the earlier transfers.

Defendants' Memorandum at 4.

The parties' arguments are examined below. Based on the burdens of proof applicable to the claims at issue, I find the Trustee is successful on one of his claims, but not the other.

## DISCUSSION

### I. SECTION 544(B) AND THE UFTA

■ Pursuant to Code § 544(b), the Trustee "may set aside any transfer that is voidable under applicable state law[.]" *Bally's Park Place, Inc. v. Rush (In re Schaps),* 58 B.R. 581, 584 (E.D.Pa.1986), *aff'd,* 815 F.2d 693 (1987). As stated above, the state law being relied upon by the Trustee here is the UFTA.[12]

The pertinent sections of the UFTA are §§ 5104(a)(1) and 5105. While § 5104(a)(1) requires a showing of actual

---

12. The UFTA which became effective February 1, 1994, is the re-enactment of Pennsylvania's Uniform Fraudulent Conveyance Act ("UFCA"), 39 P.S. §§ 351–363. *See In re Estate of Israel,* 435 Pa.Super. 347, 354 n. 6, 645 A.2d 1333, 1337 n. 6 (1994).

13. Section 5104(a)(1) of the UFCA is similar to § 357 of the UFCA which provided:
> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

fraud, § 5105 does not. *See 718 Arch Street Associates, Ltd. v. Blatstein (In re Blatstein),* 192 F.3d 88 (3d Cir.1999) (noting that § 5104(a) of the UFTA "provides liability under an 'actual intent' theory of fraud" while § 5105 is a constructive fraud provision). Section 5104(a)(a) provides, in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay or defraud any creditor of the debtor[.]

12 Pa.C.S.A. § 5104(a)(1).[13] In contrast, § 5105 states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. § 5105.[14]

■ Based on the plain language of these two statutory provisions, they apply only to transfers made by the debtor. Since the Trustee is the movant herein, I conclude that he has the burden of proof

---

39 P.S. § 357 (repealed).

14. Section 5105 of the UFTA is similar to § 354 of the UFCA which stated:
> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration.

39 P.S. § 354 (repealed).

on this issue. *See United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556, 577 (M.D.Pa.1983) (noting that under the UFCA, which was the predecessor to the UFTA, the creditor or movant bears the burden of establishing that "a conveyance was made or obligation incurred ... by one in debt[.]"). *See also In re Elliott*, 83 F.Supp. 771, 773 (E.D.Pa.1948) (emphasis added) (stating that "Pennsylvania law, which has adopted the Uniform Fraudulent Conveyance Act, places the burden of going forward with the evidence upon the wife, *when property belonging to her husband is transferred to her* while he is in debt, to show that he was solvent or that she paid a fair consideration for the property."), *aff'd*, 173 F.2d 895 (3d Cir.1949); *Nimick v. Shuty*, 440 Pa.Super. 87, 99, 655 A.2d 132, 138 (1995) (emphasis added) (applying rule of law applicable to § 354 of the UFCA that the movant/creditor bears the initial burden of proving that the grantor was in debt at the time of *his conveyance* ).

Defendants admit that Debtor deposited seven of his own paychecks totaling $7,496.91 into Mrs. Nam's Sole Account so it is undisputed that he made these transfers from his assets to Mrs. Nam. However, as to the other transfers, namely the deposit of the $1,517.74 check into the Sole Account and the transfers involving the Prime Bank CDs, the issue is not so easily resolved.

■■■ Under the UFTA, a transfer is defined as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." 12 Pa.C.S. § 5101. The term "asset" is defined, in pertinent part, as:

> Property of a debtor. The term does not include ...(3) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

*Id.* Under Pennsylvania law, "property held as tenants by the entireties is exempt from process by a creditor of only one spouse[.]" *In re Houck*, 184 B.R. 21, 23 (Bankr.E.D.Pa.1995) (citations omitted). *See also In re Riley*, 48 B.R. 194, 196 (Bankr.E.D.Pa.1985) (noting that in Pennsylvania, "a creditor of a debtor alone may not levy on the debtor's undivided individual interest" in entireties property); *Garden State Standardbred Sales v. Seese*, 417 Pa.Super. 15, 22, 611 A.2d 1239, 1243 (1992) ("It is well settled that Pennsylvania subscribes to the majority view which holds that entireties property is unavailable to satisfy the claims of the creditor of only one of the tenants."). Consequently, entireties property in Pennsylvania is not an "asset" under the UFTA. *Reitmeyer v. Meinen (In re Meinen)*, 232 B.R. 827, 840 (Bankr.W.D.Pa.1999). *See also Page v. Corn Exchange National Bank & Trust Co.*, 314 Pa. 411, 415, 171 A. 560, 562 (1934) (reasoning that where title to property was in the name of husband and wife as tenants by the entireties, the husband's creditors could not "have subjected such property to the liens of any judgments obtained by them, nor could they have prevented its transfer by the couple to an outside purchaser" and, consequently, the creditors "could not in any event be defrauded by the conveyance of the title to [the wife].").

■■■ According to the evidence in the record, the account on which the check for $1,517.74 was drawn was the Defendants' Joint Account. Under Pennsylvania law, "[w]here property or an account is placed in the names of a husband and wife, a gift and the creation of an estate by the entireties is presumed even though the funds used to acquire the property or to establish the account were exclusively those of the husband." *In re Estate of Holmes*, 414 Pa. 403, 406, 200 A.2d 745, 747 (1964). *See also Constitution Bank v. Olson*, 423 Pa.Super. 134, 140, 620 A.2d 1146, 1149 (1993) ("An intention to create the entirety is assumed from the deposit of an asset in both the names of the husband and wife, without more, and from the fact of a marital relationship."). "In order to overcome

the presumption that an estate by the entireties exists ...., there must be clear and convincing evidence to the contrary." *In re Estate of Holmes, supra,* 414 Pa. at 406, 200 A.2d at 747. Since the Joint Account is in the names of both Debtor and Mrs. Nam and they are married, the account is presumed to be owned by Defendants as tenants by the entireties. Given the absence of evidence in the record to the contrary, the presumption has not been overcome. Since the Joint Account is presumed to be entireties property, it is not an "asset" under the UFTA and Debtor's conveyance of $1,517.74 in funds from the Joint Account to the Sole Account is not a transfer as that term is used under the UFTA.[15] Thus, Debtor did not make a transfer for purposes of the UFTA when he transferred the $1,517.74 to the Sole Account.

The remaining transfers at issue involve the Prime Bank CDs. Defendants contend that these transfers were primarily made with assets belonging solely to Mrs. Nam and not the Debtor. At trial, the Trustee stressed again and again through his direct examination that Debtor has experience in handling banking matters and investing in certificates of deposit and that he assisted Mrs. Nam in obtaining the Prime Bank CDs because of his expertise in such matters. However, the Trustee never offered any testimonial or documentary evidence to prove that Debtor's funds were used to purchase the CDs. In contrast, Defendants presented expert testimony by Scherf that, in his professional opinion, Mrs. Nam used $26,169.75 of her separate and solely owned assets (consisting of her severance pay and unused vacation time from Stadlus, uncashed pay-

checks, IRA checks and unemployment compensation) to fund the Prime Bank CDs. As for the remaining $8,830.25 invested in the CDs, he testified that $8,561.00 of that amount was attributable to withdrawals made from Mrs. Nam's Sole Account, but that he could not account for the source of the remaining $269.25. Scherf explained how he arrived at his opinion, identifying the documentary evidence which supported the Defendants' explanations of the source of the funds for each CD as detailed above. Scherf admitted on cross-examination that he could not state his opinion to an absolute certainty, but stated that he found the Defendants' explanations for the source of the funds reasonable in light of the documentary evidence consistent therewith.

Based on Scherf's testimony, I conclude that Mrs. Nam used $26,169.75 of her sole assets to fund the Prime Bank CDs. I also find that she used $8,561.00 from her Sole Account, of which potentially $7,496.91 represents funds from Debtor's paychecks, to fund the CDs.[16] As for the remaining $269.25, I find no evidence in the record regarding the source of these funds. Based on Scherf's testimony, I further conclude that the first and second CDs, which were purchased on June 15, 1998 and July 9, 1998, respectively, were obtained with Mrs. Nam's sole assets whereas the third and fourth CDs, which were purchased on October 12, 1998 and November 30, 1998, respectively, were obtained with a combination of Mrs. Nam's sole assets and withdrawals from her Sole Account which contained deposits of Debtor's paychecks.

As noted above, the Trustee contends that even if Mrs. Nam's sole assets were

---

15. The Trustee has not asserted that any deposits into the Joint Account were fraudulent. Consequently, I make no findings on this issue. *See Reitmeyer v. Meinen (In re Meinen), supra,* 232 B.R. at 840–42 (concluding that a debtor's deposit of his own funds into a bank account jointly owned with his spouse as tenants by the entireties constitutes a transfer under the UFTA, but that such deposits "are not fraudulent as to the debtor's creditors to

the extent such funds are then used to satisfy reasonable and necessary expenses for the maintenance of said debtor's family.").

16. Absent the evidence which Defendants presented, I would have no evidence before me regarding the source of the funds used to obtain the Prime Bank CDs.

used to fund the Prime Bank CDs, by placing the certificates in her name "in trust for" the Debtor, she transferred ownership of them to the Debtor and, consequently, when the CDs were liquidated, the funds belonged to the Debtor. The Trustee never explained the legal underpinnings of and never provided any authority for this contention. Notwithstanding the Trustee's silence, Defendants have responded to the Trustee's argument as if he had posited that by titling the CDs as "Yeong Nam in trust for Gi Nam," Yeong Nam created irrevocable trusts in favor of Gi Nam as the beneficiary. Accordingly, for the sake of argument, I will treat the Trustee's legal theory as such. In any event, Defendants dispute this argument, asserting that by titling the CD's as "Yeong Nam in trust for Gi Nam," Mrs. Nam simply created "totten trusts" over which she retained complete control and ownership. Challenging this assertion, the Trustee contends that Mrs. Nam did not create totten trusts because: (i) the law of totten trusts is not applicable to certificates of deposit; and (ii) the CDs were not secured with Mrs. Nam's sole assets. *See* Trustee's Memorandum at 7.

■■■■ In *Cannuni v. Schweiker (In re Cannuni)*, 740 F.2d 260 (3d Cir.1984), the Third Circuit described the characteristics and effect of totten trusts, also commonly called tentative trusts, stating:

> Pennsylvania courts have ... long recognized "totten trusts," that is, bank accounts in the name of the depositor "in trust for" a beneficiary. These arrangements are presumptively revocable at the will of the depositor. The depositor retains complete control over these funds during the lifetime; ownership vests in the donee only on the depositor-trustee's death.

*Id.* at 265 (citations omitted). Contrary to the Trustee's assertion, the Third Circuit specifically recognized that the totten trust doctrine under Pennsylvania law currently applies to certificates of deposit. *See id.* at 265 n. 2.

■ Originally, totten trusts in Pennsylvania were limited to savings accounts. *See In re Estate of Brose*, 416 Pa. 386, 394–95, 206 A.2d 301, 306 (1965) (acknowledging that law of Pennsylvania recognizes totten trust doctrine "with respect to a deposit in a savings account by one person of his own money in his own name as trustee for another."). However, in 1976, the legislature enacted 20 Pa.C.S.A. §§ 6301–6306 (Supp.2000), which the state courts in Pennsylvania refer to as the Multiple–Party Account Act ("MPAA"). *See e.g., In re Estate of Cambest*, 756 A.2d 45, 53 (Pa.Super.2000); *Carney v. Carney*, 449 Pa.Super. 179, 673 A.2d 367, 368 (1996). In this act, which was created in part to "reduce certain questions concerning ... the so-called Totten trust accounts," 20 Pa.C.S.A. § 6301 (Supp.2000), Official Comment–1976, the legislature extended the law of totten trusts to certificates of deposit. *In re Estate of Agostini*, 311 Pa.Super. 233, 253 n. 5 & 256, 457 A.2d 861, 872 n. 5 & 873 (1983). *See also* 20 Pa.C.S.A. §§ 6301, 6304 (Supp.2000). Consequently, there is no question that under Pennsylvania law, a certificate of deposit can be a totten trust.

■ As for the Trustee's second basis for contending that the Prime Bank CDs were not totten trusts,[17] namely that they do not constitute totten trusts because they were not obtained solely with Mrs. Nam's assets, this argument is inapplicable to the first and second CDs given my conclusion that these CDs were purchased

---

17. In his pretrial memorandum, the Trustee also argued that "even if the certificates of deposit were capable of being held as a totten trust, any trust created was invalidated because it was created for the purpose of defrauding Defendants' creditor the City." Trustee's Memorandum at 7–8. This argu-

ment is unpersuasive. Since the first and second CDs were obtained with Mrs. Nam's sole assets, the Defendants did not defraud anyone by maintaining ownership of them in Mrs. Nam. As to the third and fourth CDs, I assume in my discussion, *see infra* at 30, that they were not totten trusts.

with Mrs. Nam's sole assets. Thus, as to the first and second CDs, I reject the Trustee's arguments that these CDs do not constitute totten trusts.

 However, as to the third and fourth CDs which I concluded were obtained with a combination of Mrs. Nam's sole assets and withdrawals from the Sole Account (into which seven of Debtor's paychecks were deposited), the Trustee's second argument is applicable. It is apparent from reviewing Pennsylvania case law that, at least historically, a totten trust was created "only when a person deposits His own money, in his own name as trustee for another in a savings bank." *In re Estate of Dillon*, 441 Pa. 206, 272 A.2d 161 (1971) (capitalization in original). *See also In re Estate of Sayre*, 443 Pa. 548, 551–52, 279 A.2d 51, 52 (1971); *In re Estate of Brose*, 416 Pa. 386, 394, 206 A.2d 301, 306 (1965); *In re Estate of Agostini, supra*, 311 Pa.Super. at 255–56, 457 A.2d at 873. However, this requirement does not appear in the MPAA. *See* 20 Pa.C.S. §§ 6301–6306 (Supp.2000).

Section 6301 of the MPAA is a definitional section. It states, in pertinent part:

"Account" means a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, saving account, certificate of deposit, share account and other like arrangements.

"Beneficiary" means a person named in a trust account as one for whom a party to the account is named as trustee.

"Multiple-party account" is either a joint account or a trust account ...

"Party" means a person who, by the terms of the account, has a present right, subject to request, to payment from a multiple-party account. A beneficiary of a trust account is a party only

after the account becomes payable to him by reason of his surviving the original trustee. Unless the context otherwise requires, it includes a guardian, personal representative, assignee, or, attaching creditor, of a party. It also includes a person identified as a trustee of an account for another whether or not a beneficiary is named, but it does not include any named beneficiary unless he has a present right of withdrawal.

"Trust account" means an account in the name of one or more parties as trustee for one or more beneficiaries where the relationship is established by the form of the account and the deposit agreement with the financial institution and there is no subject of the trust other than the sum on deposit in the account; it is not essential that payment to the beneficiary be mentioned in the deposit agreement....

20 Pa.C.S. § 6301 (Supp.2000). Section 6303, entitled "Ownership during lifetime," provides, in relevant part:

Trust account.—Unless a contrary intent is manifested by the terms of the account or the deposit agreement or there is other clear and convincing evidence of an irrevocable trust, a trust account belongs beneficially to the trustee during his lifetime ... If there is an irrevocable trust, the account belongs beneficially to the beneficiary.

20 Pa.C.S. § 6303(b) (Supp.2000).[18] Lastly, section 6304, which governs the "Right of survivorship," states, in pertinent part:

Trust account.—At the death of the trustee ... any sum remaining on deposit belongs to the person or persons named as beneficiaries, if surviving[.]

20 Pa.C.S.A. § 6304(b). While these statutory sections generally reflect the law on

18. The Official Comment to § 6303 provides: This section reflects the assumption that a person who deposits funds in a multiple-party account [which according to the definitions in § 6301 includes a Trust account] normally does not intend to make an irrevocable gift of all or any part of the funds represented by the deposit. Rather, he intends no present change of beneficial ownership.
20 Pa.C.S. § 6304, Official Comment–1976 (Supp.2000).

totten trusts as developed under Pennsylvania case law, there is no mention in any of the sections of any requirement that the funds deposited into a savings account or used to obtain a certificate of deposit must belong solely to the depositor in order to create a "trust account." Accordingly, under the law of Pennsylvania, that requirement may no longer exist. There is no case law discussing the issue.

However, even assuming the requirement still exists and for that reason the totten trust doctrine does not apply to the third and fourth CDs, I still reject the Trustee's contention that by titling the CDs as "Yeong Nam in trust for Gi Nam," Mrs. Nam created irrevocable trusts in favor of the Debtor and thereby transferred ownership of the CDs to him. At trial, both of the Defendants testified regarding the reason Mrs. Nam had the CDs titled in her name in trust for the Debtor. Significantly, the Trustee did not object to the admissibility of this testimony.

According to the Defendants' testimony, the officials at Prime Bank advised Mrs. Nam, through the Debtor, that if the CDs were placed in her name only, it would make it more difficult upon her death to liquidate them and that she should remedy this problem by naming one of her family members as the beneficiary of the CDs. Based on this advice, Mrs. Nam chose to put the CDs in her name in trust for her husband.

I find the Defendants' testimony on this matter credible. Furthermore, based on *In re Estate of Brose, supra,* 416 Pa. at 397, 206 A.2d at 307,[19] and *In re Furjanick's Estate,* 375 Pa. 484, 489, 100 A.2d 85, 88 (1953),[20] I find that such evidence may

**19.** In *In re Estate of Brose,* an account was opened in the name of Irma E. Brose in trust for Nicholas A. Brose. The Pennsylvania Supreme Court held that parol evidence was admissible to prove the intention of the parties with respect to whether the account was intended to be a revocable or irrevocable trust. In so holding, the court reasoned as follows:

> Where property of any kind (with exceptions hereinafter discussed) is placed in the name of the donor or settlor in trust for a named beneficiary, unless a power of revocation is expressly or impliedly reserved, the general principle of law is well settled that such facts create a trust which is prima facie irrevocable. Moreover, the authorities are in accord that the actual intention of the donor or settlor is so uncertain that it may be shown by parol evidence.
>
> However, an exception to the general principle was engrafted onto and was incorporated in the law of Pennsylvania with respect to a deposit in a savings account by one person of his own money in his own name as trustee for another....
>
> However, on the present record it would appear that Irma's trust for Nicholas was not a tentative or revocable trust since it was created from the joint earnings of Irma and Nicholas and not with Irma's own money. If this is correct, it could not be a tentative trust, as the Orphans' Court erroneously assumed it to be. Since parol evidence is admissible to prove the intention of the parties with respect to this account and whether a revocable or irrevocable trust

> was intended to be created, it is only fair and equitable to remand the record to the Orphans' Court for a further hearing and subsequent determination of this issue[.]

416 Pa. at 394–96, 206 A.2d at 306–07 (citations omitted).

**20.** In *In re Furjanick's Estate, supra,* the Pennsylvania Supreme Court addressed whether testimony regarding a donor's intent in opening new savings and checking accounts in the names of himself and his niece was admissible. In discussing the issue, the Pennsylvania Supreme Court summarized the principles of law applicable to the admission of parole evidence in circumstances involving bank accounts put in the name of the depositor in trust for "X," stating:

> The deposit of cash in a savings account or checking account in the name of the depositor in trust for 'X', creates presumptively a tentative or revocable trust, but since it is incomplete there is ambiguity or doubt as to whether depositor intended a revocable trust or an irrevocable trust or absolute gift, or no trust at all, and consequently parol evidence is admissible in such cases to show what the actual intention of the depositor or donor was; and this intention can be shown by statements, declarations, admissions, acts and conduct of the parties, at the time of as well as after and before the deposit.

375 Pa. at 489, 100 A.2d at 88. Ultimately, the Pennsylvania Supreme Court decided that testimony regarding the donor's intent was

be considered in determining whether Mrs. Nam intended to create a revocable or irrevocable trust by putting the CDs in her name in trust for Debtor. *Accord* Restatement (Second) of Trusts § 58 cmt. a (1959).[21] Considering the Defendants' testimony, I conclude that she did not intend to create irrevocable trusts when she obtained the CDs and, consequently, that she retained ownership of them through their liquidation.

Summarizing my analysis and conclusions to this point regarding the Prime Bank CDs, I have found that Mrs. Nam's sole assets were used to obtain the first and second CDs, but that the third and fourth CDs were obtained with Debtor's assets to the extent the funds from the Sole Account can be attributed to the $7,496.61 deposited therein from Debtor's paychecks. I have further concluded that the first and second CDs were totten trusts which means that Mrs. Nam retained ownership of them even though she held them "in trust for Gi Nam," and that even if the third and fourth CDs are not totten trusts, ownership of the CDs remained with Mrs. Nam because she did not intend to create irrevocable trusts which would have transferred ownership to the Debtor.

Thus, the only transfers to which §§ 5104(a)(1) and 5105 may be applicable are: (1) the deposits of Debtor's paychecks totaling $7,496.91 into the Sole Account; and (2) the purchase and liquidation of the third and fourth Prime Bank CDs to the extent the funds used to obtain the CDs came from the $7,496.61 in Debtor's paychecks that were deposited into the Sole Account.[22] These transfers are discussed individually below.

## A. The Paychecks

### (i) *Section 5104(a)(1) of the UFTA*

Under § 5104(a)(1) of the UFTA, the deposits of Debtor's paychecks into the Sole Account were fraudulent if "the [D]ebtor made the transfer[s] ... with actual intent to hinder, delay or defraud[.]" 12 Pa.C.S.A. § 5104(a)(1). Under Pennsylvania law, a property transfer between spouses for nominal consideration is presumed fraudulent. *United States v. Green*, 201 F.3d 251, 254 (3d Cir.2000); *United States v. Klayman*, 736 F.Supp. 647, 649 (E.D.Pa.1990). The transferee spouse may defeat the fraud claim only by proving by clear and satisfactory proof that the transaction was fair. *Id.* at 648–49. *See also United States v. Green, supra*, 201 F.3d at 255–56; *County of Butler v. Brocker*, 455 Pa. 343, 347–48, 314 A.2d

inadmissible because: (i) the case did not involve a savings account or checking account in the name of the depositor in trust for his niece; (ii) the donor and his niece signed a written agreement setting forth in detail the terms of the contract and the rights of the respective parties therein; and (iii) based on the existence of a complete written agreement, parole evidence of a prior or contemporaneous agreement which varies, modifies or conflicts with the agreement is inadmissible in evidence. *Id.* at 490–91, 100 A.2d at 88–89. In the instant case, the admissibility of Defendants' testimony regarding their intent was never raised.

21. This comment states, in pertinent part:

a. The depositor's intention. If a person makes a savings deposit in a bank in his own name "as trustee" for another person, his intention may be either (1) to create a revocable trust, or (2) to create an irrevocable trust, or (3) not to create a trust. Evidence may be admitted to show which was his intention.

In the absence of evidence of a different intention of the depositor, the mere fact that a deposit is made in a savings bank in the name of the depositor "as trustee" for another person is sufficient to show an intention to create a revocable trust.

Restatement (Second) of Trusts § 58 cmt. a (1957).

22. Based on the parties' arguments in their briefs and at trial, they seem to agree that Mr. Nam "made" the transfers of the third and fourth CDs, for purposes of §§ 5104 and 5105 of the UFTA, to the extent Mrs. Nam used funds which he transferred into her Sole Account to purchase the CDs. Based on their tacit agreement on this issue, I will not address it.

265, 268 (1974). Mrs. Nam has not met this burden.

At trial, Debtor testified that he did not have knowledge of the Bail Judgment or that he owed the City of Philadelphia any money relating to the Bail Surety Agreement until January, 1999, which was after he transferred the paychecks at issue to his wife. He further testified that the reason Debtor transferred his paychecks to Mrs. Nam was that she was upset that all her savings had been used to fund the $100,000 bail for her son. This evidence suggests that Debtor did not have knowledge of his debt to the City when he transferred his paychecks to Mrs. Nam and furnishes a reason Debtor made the transfers other than that he intended to defraud the City. However, it does not show that the transfers were fair. *See United States v. Klayman, supra,* 736 F.Supp. at 648–49 (wife failed to rebut presumption of fraud by "demonstrating by clear and satisfactory evidence that fair consideration was paid" for conveyance from husband). Debtor received no value in exchange for the paychecks he transferred to Mrs. Nam. *See* 12 Pa.C.S.A. § 5103 (defining "value" and "reasonably equivalent value").

While Debtor's intention in transferring his paychecks to Mrs. Nam may have been solely for the reason to which he testified, Mrs. Nam failed to rebut the presumption of actual fraud. Consequently, I find that the transfers of Debtor's paychecks were fraudulent under § 5104(a)(1).

(ii) *Section 5105 of the UFTA*

■ The transfers of the paychecks were also fraudulent under § 5105 if the Debtor "made the transfer … without receiving reasonably equivalent value in exchange for the transfer or obligation and [he] was insolvent at that time[.]" 12 Pa. C.S. § 5105. These conditions are met.

In *718 Arch Street Associates, Ltd v. Blatstein (In re Blatstein),* 192 F.3d 88 (3d Cir.1999), the Third Circuit explained that "if the grantor is in debt at the time of a transfer PUFTA [referring to Pennsylvania's UFTA] places on the grantee the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance." *Id.* at 98. In the instant case, it is undisputed that Debtor was in debt as of April 6, 1998, when the Bail Judgment was entered, and that he continued to be insolvent through May of 1999 when he commenced his bankruptcy case. Consequently, when he signed his paychecks over to his wife for deposit in the Sole Account, which occurred between August 14, 1998 and November 13, 1998, he was in debt. Under the principle of law cited by the Third Circuit, Mrs. Nam bears the burden of proving either that Debtor was solvent at the time of the paycheck transfers or that he was given reasonably equivalent value for them.[23] Based on the evidence in the record, she proved neither.

The record contains no evidence that Debtor was solvent at any time after the Bail Judgment was entered. Furthermore, there is no evidence that Debtor received any value in return for the transfers. Consequently, the deposits of Debtor's paychecks into the Sole Account were fraudulent transfers under § 5105.

### B. The Third and Fourth CDs

Since I have concluded that the deposits of Debtor's paychecks totaling $7,496.91 into the Sole Account were fraudulent and, consequently, that the Trustee is entitled to have them avoided, I need not address whether the purchase and liquidation of the third and fourth CDs, to the extent the funds used to obtain them came from the

---

**23.** The Third Circuit also noted that when the grantor's wife is the grantee, "the burden is on the wife to show by clear and satisfactory evidence, beyond that required of other creditors, that at the time of the transfer, he was solvent or that she paid full consideration." *718 Arch Street Associates, Ltd v. Blatstein (In re Blatstein),* 192 F.3d at 98 n. 6 (*quoting Winter v. Welker,* 174 F.Supp. 836, 843 (E.D.Pa.1959)).

$7,496.61 in Debtor's paychecks that were deposited into the Sole Account, were also fraudulent. The Trustee is entitled to recoup the $7,496.91 only once.

## II. SECTION 548(A)(1)

The Trustee also contends the transfers at issue are avoidable under 11 U.S.C. § 548(a)(1). Under this section, the Trustee "may avoid any transfer of an interest of the debtor in property[.]" 11 U.S.C. § 548(a)(1). Because this section may have broader application than the UFTA, I will analyze the Trustee's claims under this alternate theory of liability.

■■■ Section 548(a)(1) contains both an actual fraud provision and a constructive fraud provision. At trial, the Trustee made it clear that he is proceeding under both provisions. Because I find that his claim is successful under the constructive fraud provision, I need not discuss the actual fraud provision.[24]

■■■ The constructive fraud provision, which is set forth in § 548(a)(1)(B),[25] provides, in pertinent part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily ... —

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; ...

11 U.S.C. § 548(a)(1)(B). Thus, to avoid a transfer under the constructive fraud provision, "the Trustee must establish that: (1) the Debtor had an interest in the property; (2) the interest was transferred within one year of the filing of the bankruptcy petition; (3) the Debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the Debtor received less than equivalent value in exchange for such transfer." *In re Gutpelet*, 137 F.3d 748, 751 (3d Cir.1998).

### A. The Paychecks

■■■ It is undisputed that the elements of § 548(a)(1)(B) are satisfied with regard to the paychecks at issue. Debtor had an interest in the paychecks since they were his compensation from his employment. The paychecks were deposited into the Sole Account during the period beginning August, 1998 through November, 1998 so the transfers occurred during the one year reachback period. Debtor was insolvent at the time of the transfers as the Bail Judgment was entered in April of 1998. Lastly, Debtor received less than equivalent value in exchange for the transfers since Debtor made the transfers to placate his wife's complaints that her savings had been depleted to fund their son's bail and not because he was receiving anything in return. The transfers of Debtor's paychecks are avoidable under § 548(a)(1)(B).

### B. The Check for $1,517.74

■■■ It is undisputed that the Trustee established two of the four elements of § 548(a)(1)(B) as to the $1,517.74 check. Since the check was signed by Debtor on November 28, 1998 and promptly deposited into the Sole Account, the

---

24. Under the actual fraud provision, the Trustee bears the burden of establishing that the transfers at issue were made by the Debtor with the actual intent to hinder, delay or defraud his creditors. *Beard v. DeVito (In re DeVito)*, 111 B.R. 529, 531 (Bankr.W.D.Pa. 1990). Based on the evidence in the record, the Trustee did not satisfy this burden. Consequently, if I were to rule on the actual fraud provision, I would find in favor of the Debtor.

25. Prior to an amendment in 1998, the constructive fraud provision was § 548(a)(2). *See Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.)*, 181 F.3d 505, 514 & n. 6 (3d Cir.), *cert. denied*, 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 (1999).

transfer occurred within the required one year reachback period. Moreover, since the Bail Judgment was entered on April 6, 1998, the Debtor was insolvent at the time the check was deposited in the Sole Account. The remaining two elements at issue are: (i) whether Debtor had "an interest" in the funds transferred; and (ii) whether Debtor received less than equivalent value in exchange for the transfer.

Based on case law applicable to 11 U.S.C. § 541(a) which holds that a debtor has an interest in property which he owns as a tenant by the entirety, *see e.g., Napotnik v. Equibank and Parkvale Savings Association,* 679 F.2d 316, 318 (3d Cir. 1982) (ruling that "an individual debtor's interest in property held as a tenant by the entirety" fits within the definition under 11 U.S.C. § 541(a) of "all legal or equitable interests of the debtor in property[.]"), I conclude that Debtor had an interest in the $1,517.74 transferred from the Joint Account to the Sole Account because he owned such funds as a tenant by the entireties. This interest is sufficient to subject the transfer to the Trustee's avoidance powers under § 548(a)(1). *See Webster v. Hope (In re Hope),* 231 B.R. 403, 425 (Bankr.D.C.1999) (concluding that a debtor who owns property as a tenant by the entireties possesses an interest in such property for purposes of § 548(a)); *Cooper v. Osbourne (In re Osbourne),* 124 B.R. 726, (Bankr.W.D.Ky. 1989) (ruling that the debtor had transferred an interest of his in property under § 548(a) when he transferred his interest as a tenant by the entireties in marital residence to his wife).

As for whether the Debtor received less than equivalent value in exchange for the transfer, Debtor testified at trial that he could not remember the reason he wrote this particular check, but offered two possible explanations for the same. He suggested that he might have written the check in response to Mrs. Nam's complaints about the depletion of her savings or as a repayment to Mrs. Nam for household goods which she had paid for with her money. With regard to the latter possibility which suggests that Debtor received something of value in exchange for the check at issue, Debtor explained that on Fridays, Mrs. Nam would go shopping while he was at work. When she used her own money to pay for purchases for the house, she would demand repayment from him.

I am not persuaded that Debtor transferred the $1,517.74 check to Mrs. Nam in exchange for household goods. Debtor specifically testified that he could not recall why he wrote the check. Considering the amount of the check, which is approximately $500 more than Debtor's regular paychecks as exemplified by the seven paychecks which he fraudulently transferred to Mrs. Nam, I find it difficult to believe that Defendants could not specifically recall the reason the check was written. Moreover, assuming that Mrs. Nam purchased household goods equal to this amount, I would expect Defendants to recall what they were. Certainly, she did not spend this amount on food. Therefore, I conclude that the Trustee has established the fourth and final element of § 548(a)(1)(B), namely that Debtor received less than a reasonably equivalent value in exchange for the transfer. The transfer of the $1,517.74 check is avoidable under § 548(a)(1)(B).

### C. The Third and Fourth CDs

The funds used to purchase the third and fourth Prime Bank CDs belonged to the Debtor only to the extent the funds in the Sole Account can be attributed to the $7,496.61 deposited therein from Debtor's paychecks. I have already concluded that the deposit of the $7,496.61 in paychecks into the Sole Account is avoidable under § 548(a)(1)(B) which entitles the Trustee to proceed under § 550 (Liability of transferee for avoided transfer) to recover this transfer. Debtor is entitled to recover the $7,496.61 only once; therefore, it is irrelevant whether the elements of

§ 548(a)(1)(B) are met as to the Prime Bank CDs.

## III. SUMMARY

The Trustee is entitled to judgment in his favor on: (i) his claim under 11 U.S.C. § 544(b) as to the $7,496.61 in paychecks; and (ii) his claim under 11 U.S.C. § 548(a)(1)(B) as to the $7,496.61 in paychecks as well as the $1,517.74 check that were deposited into the Sole Account. These transfers shall be avoided.

An Order consistent with this Opinion shall be entered.